T.C. Memo. 2005-77

UNITED STATES TAX COURT

LETANTIA BUSSELL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15462-02.                    Filed April 7, 2005.

Letantia Bussell, pro se.[1]

Ron S. Chun, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioner petitioned the Court to redetermine a $464,930 deficiency in her 1996 Federal income tax and a

---

[1] Petitioner filed her petition pro se on Sept. 30, 2002, and represented herself at trial.  Robert L. Kaufman entered the case on Oct. 29, 2002, but withdrew on July 25, 2003.  Jonathan A. Brod entered the case on July 16, 2003, but withdrew on Oct. 30, 2003.

related $348,697 fraud penalty under section 6663(a).[2]  Following respondent's concession of an adjustment alleged in his amended answer, we must decide the following four issues as to 1996:

1.  Whether respondent arbitrarily or erroneously determined that petitioner failed to report dividend income of $1,149,048. We hold that he did not.

2.  Whether petitioner is liable for the fraud penalty under section 6663(a), and, if so, whether section 6501(c)(1) applies to annul the 3-year period of limitations under section 6501(a). We hold that she is and that section 6501(c)(1) annuls the 3-year period of limitations.

3.  Whether respondent's determination is barred by judicial estoppel.  We hold that it is not.

4.  Whether petitioner is entitled to relief under section 6015.  We hold that she is not.

FINDINGS OF FACT

I.  Overview

The parties submitted to the Court stipulated facts and related exhibits.  We find those stipulated facts accordingly and incorporate those facts and exhibits herein.  The Court also deemed admitted certain matters pursuant to Rule 91(f).  We incorporate herein by this reference those matters deemed

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years, and Rule references are to the Tax Court Rules of Practice and Procedure.

admitted under Rule 91(f).  Petitioner resided in Los Angeles, California, when her petition was filed in this Court.

Petitioner is a well-educated, intelligent, and highly motivated individual.  She is deeply involved in every aspect of her business affairs and, as of 1992, had substantial experience with business, finance, corporations, lawyers, and accountants. She timely filed a 1996 joint Federal income tax return (1996 return) with her husband, John Bussell (Bussell).  She married Bussell in 1972, and they remained married until he took his own life in 2002, near the completion of his and petitioner's criminal trial discussed infra.

Petitioner is a licensed physician and is board certified in dermatology.  She opened her dermatology practice (dermatology practice) in March 1979, in Beverly Hills, California.  In 1981, she formed a wholly owned corporation, Letantia Bussell M.D., Inc., and that corporation operated the dermatology practice from then until 1991.  While the dermatology practice was operated by Letantia Bussell M.D., Inc., petitioner received most if not all of the net income generated by that practice as either wages or distributions from the corporation.

II.  Formation of Nominee Corporations

In 1991, petitioner instructed her attorneys, Jeffrey Sherman (Sherman) and Robert Beaudry (Beaudry), to terminate Letantia Bussell M.D., Inc., and in its stead to form a medical

management corporation and two other medical corporations (collectively, the three corporations) in which petitioner would ostensibly own no interest. Pursuant to petitioner's instructions, the attorneys formed the three corporations without any apparent ownership by petitioner but with the apparent ownership by third-party nominees. Petitioner in fact owned each of the three corporations. Petitioner caused the three corporations to be formed with the express intent of defrauding creditors, including respondent, by concealing her assets and income during a bankruptcy that she would file in connection with a scheme (bankruptcy scheme) to maximize retention of her assets. This income included income derived from the dermatology practice.

The medical management corporation, BBL Medical Management, Inc. (BBL), was incorporated in California in June 1992. It operated the dermatology practice under the name "Beverly Hills Dermatology Consultants, A Medical Group". BBL received all of the income earned in the dermatology practice, employed the dermatology practice's medical staff, and collected moneys due to the dermatology practice from insurance companies and patients. BBL also paid the dermatology practice's business expenses and purchased its supplies.

Petitioner was advised by Beaudry that BBL should be owned `by a third-party nominee in order to conceal petitioner's actual ownership of BBL. Petitioner selected Assieh Ghassemi

(Ghassemi), an employee and bookkeeper of the dermatology practice since 1983, as BBL's apparent owner, president, and chief executive officer (CEO). Ghassemi signed BBL's incorporation documents at the request of petitioner and Bussell (collectively, the Bussells) but had no duties or responsibilities as BBL's owner, president, or CEO. Ghassemi's sole function was to sign blank checks drawn on a BBL account when they were presented to her by either of the Bussells. (Bussell was BBL's president and secretary.) In August 1995, BBL was replaced as the operator of the dermatology practice by a fourth corporation, Beverly Hills Management, Inc., but BBL was neither terminated nor liquidated at that time. On November 15, 1995, BBL's board of directors met and adopted a resolution authorizing Bussell to open for BBL a bank account with Paine Webber (the Paine Webber account, described infra). On January 16, 1996, Bussell opened up the Paine account in the name of BBL.

Petitioner formed the second of the three corporations, Beverly Hills Dermatology Medical Corp. (BHDMC), in California in February 1993. Beaudry advised petitioner that BHDMC should be owned by a third-party doctor, and petitioner asked her friend Marilyn Lange, M.D. (Lange), to assist her with respect to BHDMC. At petitioner's request, Lange served as BHDMC's apparent, but

not actual, owner and director.  The Bussells gave BHDMC's incorporation documents to Lange, and she signed them.  Lange had no involvement in the daily operations of BHDMC and opened no corporate bank accounts for BHDMC.  Lange's name was used as the signatory on a BHDMC bank account, and her name was signed on checks drawn from this account without either her actual signature or her consent to the signing of her name.  Lange had no involvement in the banking of BHDMC, and she did not have any financial interest in BHDMC.

The third of the three corporations was LB Bussell Medical Corp. (LBB), incorporated in California in June 1992.  From 1993 to 1996, petitioner was identified as an employee of LBB, and it paid her all of the wages that she received during those years.  At the beginning of 1994, petitioner became the sole shareholder of LBB in form as well as in substance.

III.  Petitioner's Tax Liabilities

In 1991, petitioner received notice from respondent that she potentially owed $1.2 million in Federal income taxes for 1983, 1984, 1986, and 1987.  Petitioner met with Sherman to discuss these taxes sometime before December 20, 1991, when respondent issued to her a notice of deficiency for those 4 years.  Petitioner, represented by Sherman, petitioned this Court as to that notice of deficiency.  The resulting case, docket No. 6156-92, was ultimately settled pursuant to a stipulated decision

filed on June 25, 1993.  As of March 1995, petitioner's unpaid tax liabilities arising from that case had grown to approximately $1 million, a sum which remained unpaid as of May 17, 2002.

IV.  The Bankruptcy Scheme

The Bussells met with Sherman in 1991 to discuss the Bussells' outstanding tax and nontax liabilities.  In late 1991 or early 1992, Sherman introduced the Bussells to Beaudry, and the four of them met in petitioner's livingroom and discussed both the Bussells' liabilities and aspects of petitioner's finances.  During initial meetings with petitioner, Beaudry suggested a two-step scheme to defraud her creditors.  (In later meetings with petitioner, as discussed infra, Beaudry expanded on this suggestion as a method for petitioner also to accomplish her objective of evading Federal income taxes on her income as well as the income of entities that included at least BBL.)  Under the first step, the Bussells would change title to their assets and form nominee corporations; i.e., corporations that ostensibly would be owned by someone other than the Bussells but which in fact would be owned by one or both of the Bussells.  Those corporations would then realize the income earned by the dermatology practice in a fashion that would not allow that income to be attributed to petitioner.  Under the second step, the Bussells would declare bankruptcy to discharge their creditors' claims.  Beaudry finalized these suggestions in a

written analysis of petitioner's assets and liabilities, concluding with a series of recommendations.  Petitioner asked specific questions as to the bankruptcy scheme, e.g., who would be involved in it, what would it cost, and what were the advantages and disadvantages of certain decisions, and she expressly approved the bankruptcy scheme's purpose of defrauding creditors.  Petitioner was an active participant in formulating most, if not all, of the details of the bankruptcy scheme.

After petitioner approved the bankruptcy scheme, Beaudry usually met with Bussell regarding the scheme's administrative details.  Beaudry would contact petitioner the day of the meeting, or soon thereafter, to inform her of the matter that had been addressed and to confirm that she agreed with the decisions made.  All of the decisions made regarding the dermatology practice were expressly approved by petitioner, and only recommendations approved by petitioner were implemented.

V.   Concealment of Assets

On May 26, 1993, with the consent of petitioner, Beaudry formed a shell corporation, Syntex Financial Corp. (Syntex), in the British Virgin Islands.  Also around that time, the Bussells traveled to Zurich, Switzerland, with a personal friend, a German citizen named Gerd Kusch (Kusch).  There, they opened a bank account at Swiss Bank Corp. in the name of Syntex (Syntex account).  Kusch was named in form as the "investment advisor"

for the Syntex account, but he had no duties or responsibilities in that capacity, and he never signed any documents authorizing the transfer of funds from that account. The Bussells (and not Syntex) were the actual owners of the Syntex account, and they exercised control over the account.

In 1993, at Bussell's request, Beaudry transferred funds from Bussell's pension plan into the Syntex account. Petitioner was aware of this transfer, and before (but in connection with) this transfer she was advised by Beaudry that the transfer was a premature distribution from a pension plan, that it was required to be reported as such on her joint 1993 Federal income tax return (1993 return), and that the failure to report it as such was a crime. The Bussells did not report this transfer on the 1993 return.

During 1996, the Bussells maintained another, personal bank account at Swiss Bank Corp. (personal Swiss bank account). The Bussells failed to report the personal Swiss bank account on their 1996 return. They also failed to report the Syntex account on their personal Federal income tax returns for 1993, 1994, 1995, and 1996.

Petitioner used multiple post office boxes in an attempt to conceal her ownership of BBL and BHDMC, as well as her relationship with other entities and financial accounts. During the relevant years, the Bussells opened at least eight personal

bank accounts, using false Social Security numbers to conceal their identities.

## VI.  Concealment of Income

Pursuant to the bankruptcy scheme, petitioner caused approximately $1,149,048 of income earned by the dermatology practice from 1993, 1994, and 1995 to be accumulated in a BBL account at Sanwa Bank (Sanwa account), and she did not cause any of those funds (with the exception of a check in payment of a $51.96 check printing fee) to be withdrawn from that account until January 1996, after her bankruptcy case was discharged.  In January 1996, she caused the balance of the Sanwa account ($1,149,048) to be transferred to the personal Swiss bank account.

Petitioner caused the Sanwa account to be opened on May 14, 1993, as a non-interest-bearing account to hide further the existence of the account, and it was opened using the names of Kusch and petitioner's patient Josephine Isaacs (Isaacs) as signatories in order to hide further petitioner's actual ownership interest in the Sanwa account.  Neither Kusch nor Isaacs signed the bank's signature card, and neither Kusch nor Isaacs authorized another individual to sign for him or her.  The Bussells retained possession and control of the checkbooks and bank statements for the Sanwa account.

Implementation of the bankruptcy scheme caused an immediate and dramatic drop in petitioner's reported wage income from the dermatology practice. In 1991, petitioner reported wage income of $720,000 from the dermatology practice. In 1992, her reported wage income was $500,000. In 1993, after implementation of the bankruptcy scheme, her reported wage income for 1993, 1994, and 1995 dropped to $84,000, $98,000, and $85,000, respectively. Before implementing the bankruptcy scheme, petitioner had received virtually all of the dermatology practice's net income as wages and/or distributions from Letantia Bussell M.D., Inc. After implementing the bankruptcy scheme, petitioner reported only the income that she received as an "employee" of LBB. Despite knowing that it was a crime to do so, petitioner omitted from the 1996 return the $1,149,048 that she caused in that year to be transferred from BBL's Sanwa account to the personal Swiss bank account.[3] BBL had sufficient earnings and profits to characterize the $1,149,048 transfer as a dividend to petitioner.

VII. Petitioner's Bankruptcy and Ensuing Events

On March 7, 1995, petitioner filed a petition for chapter 7 bankruptcy, seeking (with Bussell) to discharge tax and nontax liabilities totaling approximately $4.7 million. Of this amount,

---

[3] Although BBL was replaced by Beverly Hills Management in August 1995 as the operator of the dermatology practice, BBL remained the named owner of the Sanwa account until January 1996. As of the later time, BBL was also the named owner of the Paine Webber account.

over $1 million was Federal taxes owed to respondent.  In August 1995, petitioner was granted a discharge, and her bankruptcy case was closed.

Before January 1, 1996, no withdrawals or transfers were made from, and no checks were drawn on, the Sanwa account, except for a $51.96 check written for check printing fees.  On or about December 21, 1995, petitioner met with Beaudry and Sherman to discuss a plan to transfer the full balance of the Sanwa account, all of which was attributable to BBL's operation of the dermatology practice, from the Sanwa account to her personal account by way of a series of offshore accounts to conceal the transfer.

In January 1996, Bussell forged Kusch's signature without his permission on a single $1,149,048 check drawn on the Sanwa account and made payable to Paine Webber, leaving the Sanwa account with a zero balance.  This check was deposited into the Paine Webber account.  The Paine Webber account was a brokerage account maintained by a New York, New York, office of Paine Webber.  Bussell opened the Paine Webber account in the name of BBL on January 16, 1996, and petitioner signed as a witness on documents used to open the account.

Bussell, in his capacity as an officer of BBL, was the only person authorized to withdraw funds from the Paine Webber account.  Within 1 month of its creation, all funds in the Paine

Webber account were removed from that account by way of a single check in the amount of $1,151,627 payable to "Global Capital Enterprises, Inc.".[4] This check was hand-delivered by Bussell to Beaudry, who deposited it into an offshore bank account (CITCO account) maintained in the Netherlands Antilles by an entity named CITCO Banking Corp. The purpose of making the Paine Webber check payable to Global Capital Enterprises, Inc., and then depositing that check into the CITCO account was to conceal the location of the funds. Pursuant to petitioner's instructions, Beaudry then transferred the funds from the CITCO account to the Syntex account by way of two separate transfers of $820,000 and $331,616.[5] These transfers were made separately because petitioner was concerned about the security of the transfers.

On March 25, 1996, Beaudry made the first transfer, of $820,000, from the CITCO account to a Medifor, Ltd. account in Hong Kong (Medifor account). In April 1996, Beaudry instructed an entity named TrustNet Group to obtain a cashier's check for $820,000, payable to Syntex. This cashier's check was deposited into the Syntex account on or about April 9, 1996. Bussell then

---

[4] The $2,579 difference between the $1,149,048 deposited into the Sanwa account and the withdrawn $1,151,627 was presumably attributed to income earned on the deposited funds.

[5] We note the $11 discrepancy between $1,151,627 and the sum of $820,000 and $331,616 ($1,151,616).

transferred $820,000, from the Syntex account to the personal Swiss bank account.

On May 31, 1996, Beaudry made a second wire transfer, of $331,616, from the CITCO account to the Medifor account. Beaudry then transferred $309,010 from the Medifor account to the Syntex account. On or about June 11, 1996, Bussell transferred $309,010 from the Syntex account to the personal Swiss bank account. Approximately 1 month after the second transfer, the Bussells made another trip to Zurich, Switzerland.

After these transfers into the Syntex account took place, Kusch was notified by Swiss Bank Corp. about the transfers. He then went to Swiss Bank Corp. on October 21, 1996, and formally resigned as the Syntex account's investment advisor.

VIII.  Failure To File Tax Returns

For most of the relevant years, the accounting and bookkeeping services for the Bussells and BBL were performed by Steve Berson (Berson). Berson knew that BBL was profitable and was required to file Federal income tax returns for 1992, 1993, 1994, and 1995. Berson prepared a draft 1993 Federal income tax return for BBL that reported a tax liability. Bussell directed Berson not to finalize or file that return. Berson notified petitioner of this decision and the fact that BBL was in a delinquent filing status. Petitioner did not want to pay any tax on BBL's income, and Berson was instructed to file false Federal

income tax returns for BBL.  Berson refused, and he was fired as BBL's accountant.

Petitioner told Beaudry in 1997 that she did not want BBL to pay any tax on its income and instructed him and Sherman to create a scheme whereby BBL could avoid paying taxes on its income for 1993, 1994, and 1995.  Angry that Bussell, Beaudry, and Sherman had not come up with a workable scheme to underreport BBL's income, petitioner took an active and personal role in discussing and developing alternatives to filing truthful Federal income tax returns for BBL.  She discussed various alternatives with Beaudry and Sherman, including overstating deductions and/or generating a false bad investment loss in a subsequent year and carrying it back to offset the tax liability in prior years.  She ultimately decided to understate BBL's gross receipts by a total of $1,201,974 on its returns for 1993, 1994, and 1995, knowing that this understatement would cause BBL's income to match the $1.1 million reported to respondent on Forms 1099 as BBL's income for those years.

In October 1997, Rob S. Janpanah (Janpanah) was hired to prepare BBL's delinquent Federal income tax returns in lieu of Berson.  Janpanah prepared BBL's returns for 1993, 1994, and 1995, using accounting records provided by Sherman which differed materially from those created by Berson.  Those returns underreported BBL's gross receipts by $600,180, $475,667, and

$126,127, respectively (or, in other words, a total of $1,201,974).

IX.  The Criminal Proceeding of the Bussells and Sherman

On July 5, 2000, the Bussells and Sherman were indicted for various counts related to bankruptcy fraud and attempted tax evasion.  Petitioner, in particular, was indicted for:  (1) One count under 18 U.S.C. sec. 371 of conspiracy; (2) three counts under 18 U.S.C. secs. 2 and 152(1) of concealing assets in bankruptcy; (3) two counts under 18 U.S.C. secs. 2 and 152(3) of making a false declaration and statement in bankruptcy; (4) one count under 18 U.S.C. sec. 152(2) of making a false oath and account in relation to a case under title 11; (4) one count under section 7201 and 18 U.S.C. sec. 2 of attempted evasion of the payment of tax for 1983, 1984, 1986, and 1987; and (5) one count under section 7201 and 18 U.S.C. sec. 2 of attempted evasion of the assessment of tax for 1996.  The conspiracy count related to the Bussells' conspiring with Sherman and Beaudry to form the three corporations to conceal the Bussells' assets and to make false statements as to the Bussells' bankruptcy.  The conspiracy count in relevant part alleged that the Bussells, aided by Sherman and Beaudry, made false statements in the Bussells' bankruptcy proceeding when they failed to disclose the Bussells' beneficial ownership of BBL and BHDMC.  Two of the three counts of concealing assets related to the substance of this allegation.

The tax evasion count for 1983, 1984, 1986, and 1987 alleged in relevant part that the Bussells attempted to evade the payment of $353,394 of Federal income taxes for those years by knowingly and fraudulently concealing their assets inclusive of their beneficial ownership interests in BBL and BHDMC. The tax evasion count for 1996 alleged that petitioner operated the dermatology practice through a three-tier structure, including BBL; that the Bussells effectively managed and controlled BBL through nominee owners; that the Bussells failed to report the $1,149,048 at issue as income on the 1996 return; and that the Bussells had 1996 tax due and owing to the United States.

The Bussells' criminal trial began on November 20, 2001, and ended on February 6, 2002. The trial resulted in petitioner's conviction of five of the counts related to bankruptcy fraud and the single count under section 7201 related to the attempted evasion of $353,394 of Federal income taxes for 1983, 1984, 1986, and 1987. Petitioner's convictions are currently on appeal.

X.   Petitioner's Failure To Cooperate With the Court

Rule 91(a) requires that all parties stipulate all facts and documents to the fullest extent possible. On November 18, 2003, the Court reiterated the importance of this Rule when we ordered the parties to stipulate to the greatest extent possible. On or about November 26, 2003, respondent sent petitioner a proposed stipulation of facts with exhibits (stipulation). Petitioner

refused to stipulate a single fact or document in the stipulation. Many of the facts stated in the stipulation were foundational and indisputable. For instance, the first three stipulations were: (1) "Petitioner is Letantia Bussell, whose residence address was 2285 Worthing Lane, Los Angeles, California 90077, on the date the petition was filed"; (2) "The statutory notice of deficiency upon which this case is based was mailed to the Petitioner on June 28, 2002. Attached and marked as Exhibit 1J is a true and correct copy of said notice"; and (3) "Petitioner, Letantia Bussell, was married to John Bussell during taxable years 1983 through 2002". Most of the documents in the stipulation were public and business records regarding the three corporations.

Respondent sent petitioner two supplemental stipulations of fact in March 2004 which contained other facts and more public and business records relating to BBL (supplemental stipulations I and II). These records had been prepared and maintained by Berson. Petitioner refused to stipulate a single fact or document contained in supplemental stipulations I and II.

On March 5, 2004, respondent moved the Court under Rule 91(f)(1) to order petitioner to show cause why the matters included in the stipulation should not be established as fact. Respondent did not include with this motion any of the matters addressed in supplemental stipulations I and II. The Court

granted this motion and on March 9, 2004, ordered petitioner to file a response by March 18, 2004, showing cause why the matters included within the stipulation should not be established as fact. Petitioner did not file her response until April 6, 2004.

On April 19, 2004, the Court held a pretrial hearing on our order to show cause. At this hearing, the Court found that petitioner had substantially failed to stipulate as required by Rule 91(f) and by the Court's order of November 18, 2003. The Court went through some of the disputed stipulations on the record, attempting to resolve legitimately disputed issues. Petitioner made repeated meritless objections with no legal foundation. The hearing concluded with petitioner's stipulating 11 out of 369 paragraphs in the stipulation. Because petitioner had refused to stipulate, the Court moved the trial date to April 26, 2004, and again ordered the parties to stipulate the fullest extent possible as required by Rule 91(a).

On April 22, 2004, the parties were back before the Court because petitioner refused to stipulate to business and public records, particularly those prepared by Berson. At this hearing, the Court again went through some of the stipulations with the parties, at which time petitioner stipulated an additional 19 paragraphs of the stipulation. The parties were ordered to continue the stipulation process in private.

The very next day, April 23, 2004, petitioner moved the Court to withdraw any agreement that she had made as to the stipulation, portions of which she had initialed but not signed, as well as to oral stipulations she had made to the Court during the pretrial hearings on April 19 and 22, 2004. At a pretrial hearing on April 26, 2004, the rescheduled date of the trial, petitioner filed a written motion to be relieved of all of the stipulations reached during the pretrial hearings and the weeklong meetings with respondent. Petitioner stated that she had reviewed the stipulation and supplemental stipulations I and II. She refused to sign any of them because, she asserted, she lacked "personal knowledge" of the documents. She alleged further that she had been under "duress" when she had expressed any agreement that she had made.

Respondent spent the remainder of the Court's time on April 26, 2004, attempting to move into evidence approximately 106 public and business records which petitioner refused to stipulate. Nearly all of the exhibits were admitted into evidence by the Court in the course of a 4-hour hearing. During this hearing, petitioner was given another opportunity to stipulate some or all of the documents. She refused. As a result of petitioner's intransigence, the trial was continued to a special trial session of the Court on September 20, 2004. At the conclusion of the hearing, the Court ordered both parties to

file memoranda on or before June 10, 2004, regarding the Court's order to show cause. Petitioner did not file her memorandum with the Court until July 26, 2004. On July 26, 2004, the Court made absolute in part and discharged in part the order, deeming some records admitted over petitioner's evidentiary objection.

When the case finally came to trial, the Court spent more time admitting documents which petitioner could and should have stipulated. On September 22, 2004, respondent spent approximately 45 minutes examining Berson, moving into evidence over 20 business records which petitioner had refused to stipulate. These documents were moved into evidence either with no objection from petitioner, or over meritless objections wholly lacking in legal foundation.

OPINION

I. Dividend Income

We decide whether respondent arbitrarily or erroneously determined that petitioner failed to recognize $1,149,048 in dividend income for 1996. Gross income includes any dividend received, whether or not formally declared, when distributed by a corporation to the beneficial owner of the corporation. See sec. 61(a)(7); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Walker v. Commissioner, 544 F.2d 419 (9th Cir. 1976), revg. T.C. Memo. 1972-223; Dean v. Commissioner, 57 T.C. 32, 40 (1971). A constructive dividend exists where a

taxpayer controls a corporation and uses its funds for personal purposes. <u>Yelencsics v. Commissioner</u>, 74 T.C. 1513, 1532-1533 (1980). Petitioner bears the burden of proving that respondent's determination in the notice of deficiency is arbitrary or erroneous; respondent is presumed correct once he has put forth some evidence as to the source of petitioner's income. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933); <u>Palmer v. United States</u>, 116 F.3d 1309, 1313 (9th Cir. 1997); <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977).[6]

As a threshold matter, respondent must support his determination by showing an income source beneficially owned by petitioner. <u>Weimerskirch v. Commissioner</u>, <u>supra</u>. "'Beneficial ownership is marked by command over property or enjoyment of its economic benefits.'" <u>Cordes v. Commissioner</u>, T.C. Memo. 1994-377

---

[6] Sec. 7491(a) was added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998. Sec. 7491(a)(1) provides that the burden of proof shifts to the Commissioner in specified circumstances. We conclude that sec. 7491(a) does not apply to the unreported income issue in this case. Petitioner has not in this proceeding presented "credible evidence" on that issue. See <u>Higbee v. Commissioner</u>,116 T.C. 438, 442 (2001)' see also <u>Blodgett v. Commissioner</u>, 394 F.3d 1030 (8th Cir. 2005), affg. T.C. Memo. 2003-212. Nor has she proven that she complied with the requirements of sec. 7491 (a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with respondent's reasonable requests. See <u>Weaver v. Commissioner</u>, 121 T.C. 273, 275 (2003).

(quoting Cepeda v. Commissioner, T.C. Memo. 1994-62); see also Walker v. Commissioner, supra. Respondent has shown the requisite source of income for 1996 by establishing that petitioner during that year received the $1,149,048 from BBL's Sanwa account. Respondent has also established that petitioner was the beneficial owner of BBL and its only shareholder in fact.

We view the $1,149,048 transfer from the Sanwa account to the personal Swiss bank account as a dividend to petitioner, BBL's only beneficial and true owner. Although petitioner was not BBL's ostensible shareholder, she was its beneficial, and only actual, shareholder. BBL's ostensible shareholder, Ghassemi, had no control of BBL, exercised no daily management functions, had no personal sums of money at risk in BBL, and was BBL's owner, president, and CEO in name only. In fact, the only function that Ghassemi served with respect to BBL was to sign the necessary corporate paperwork and blank checks as presented to her by the Bussells. Ghassemi even acknowledged at trial that petitioner was "the boss" and that she (Ghassemi) signed any document which either of the Bussells presented to her.

Any lingering doubt as to the true owner of BBL is dispelled by its unique history. From 1981 to 1991, the dermatology practice was operated by a single professional corporation which passed on most if not all of its profits to petitioner. In 1992, with the looming threat of unpaid taxes from the 1980s,

petitioner abruptly and drastically altered her corporate structure. Her old professional corporation was scrapped and was replaced by three nominee corporations in an arrangement which even her tax attorney admitted, while testifying under oath, illegally attempted to disguise petitioner's earnings from the provision of her medical services. These corporations were formed with the express purpose of defrauding petitioner's creditors, including respondent, and petitioner actively participated in this bankruptcy scheme, frequently asking specific questions as to it and making minute tactical decisions regarding the concealment of her assets and income. Petitioner even boasted at one time that "I worked too damn hard for this money to lose it to taxes".

Petitioner invites the Court to disregard the existence of BBL and conclude that its $1,149,048 of income, which is all attributable to 1993, 1994, and 1995, is, if at all, actually taxable in those 3 nonnotice years. We decline petitioner's invitation. Petitioner purposely chose the corporate form and actions of BBL, and she may not now argue against them. See Higgins v. Smith, 308 U.S. 473, 477 (1940). Even if she could challenge the existence of BBL in this proceeding, the record before us convinces us that BBL was in fact a bona fide corporation. BBL owned assets in its name, it held board meetings, and it employed the dermatology practice's medical

staff.  It also received all of the income earned in the dermatology practice, collected moneys due to the dermatology practice from insurance companies and patients, paid the dermatology practice's business expenses, and purchased the dermatology practice's supplies.

In sum, respondent has established a source for the $1,149,048 in determined unreported income, he has shown that petitioner beneficially owned BBL and that BBL had $1,149,048 of undistributed earnings and profits at the start of 1996, and he has demonstrated the steps by which petitioner converted the $1,149,048 of BBL's earnings and profits from BBL to her personal accounts in 1996.  Petitioner, in turn, has put forth no probative evidence to the contrary, leading to the inference that such evidence if produced would have been unfavorable to her. See, e.g., Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see also McKay v. Commissioner, 89 T.C. 1063, 1069 (1987) (failure of witness to testify to fact peculiarly within his knowledge suggests that testimony would have been unfavorable), affd. 886 F.2d 1237 (9th Cir. 1989).  We hold that respondent determined correctly in the notice of deficiency that petitioner had unreported dividend income of $1,149,048 for 1996.

## II.  Fraud

We decide whether petitioner is liable for the fraud penalty determined by respondent under section 6663(a).[7]  Respondent must prove that determination by clear and convincing evidence.  See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1113 (1983).  Respondent must prove that petitioner fraudulently intended to underpay her tax.  See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Miller v. Commissioner, 94 T.C. 316, 332-333 (1990).  Respondent may meet his burden through affirmative evidence because fraud is never imputed or presumed.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Whether fraud exists in a given situation is a factual determination that must be made after reviewing the particular facts and circumstances of the case.  DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

---

[7] In relevant part, sec. 6663 provides:

SEC. 6663.  IMPOSITION OF FRAUD PENALTY.

(a) Imposition of Penalty.--If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(b) Determination of Portion Attributable to Fraud.--If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

A.   Underpayment of Tax

Petitioner did not report or pay income tax on the $1,149,048 of income received as a dividend from BBL in 1996. She does not contest this, instead arguing that the money was in fact stolen by Beaudry and that she therefore should not have to pay tax on it.  This argument is not supported by credible evidence in the record.  We are clearly convinced on the record before us that petitioner was the only actual shareholder of BBL and that she caused the $1,149,048 to be transferred in 1996 from BBL to her personal accounts.  We conclude that petitioner received those funds as a dividend from BBL in 1996 and that her failure to pay taxes on that dividend resulted in an underpayment of her 1996 Federal income tax.

B.   Intent To Evade Tax

Fraud requires a clear and convincing showing that the taxpayer intended to evade a tax known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968).  This intent may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available.  Reasonable inferences may be drawn from the relevant facts.  See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Courts have relied on certain indicia (badges) of fraud in deciding whether a taxpayer had the requisite fraudulent intent. These badges include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, and (9) dealing in cash. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); see also Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. These badges are nonexclusive. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992). The taxpayer's education and business background are also relevant to the determination of fraud. Id. Bearing these general principles in mind, we turn to the indicia of fraud that are relevant to the instant case. The presence of several badges is persuasive circumstantial evidence of fraud. Beaver v. Commissioner, supra at 93.

1.  Understating Income

Understating income is indicative of fraudulent intent. Bradford v. Commissioner, supra.

Petitioner understated the 1996 gross income. The existence of that understatement was clearly and convincingly established by respondent at trial, where respondent showed that BBL's income

from the dermatology practice was distributed to petitioner in 1996 in the form of a dividend.  Petitioner did not report, and paid no tax on, this dividend in 1996.

This factor weighs against petitioner.

2.   Maintaining Inadequate Records

Lack of records is indicative of fraudulent intent.  Id.

Petitioner maintained inadequate records.  She kept few personal records of the bankruptcy scheme or the transactions surrounding the transfer of the $1,149,048 from the Sanwa account to the personal Swiss bank account.

This factor weighs against petitioner.

3.   Failing To File Tax Return

Failing to file tax returns is indicative of fraudulent intent.  Id.

Although petitioner filed the 1996 return timely, that action is negated by the fact that she intentionally omitted from that return her receipt of the $1,149,048 from BBL and attempted to conceal her receipt of those funds by filing untimely, incorrect, and fraudulent tax returns for BBL for 1992, 1993, 1994, and 1995.

This factor is neutral.

4.   Giving Implausible or Inconsistent Explanations of Behavior

Giving implausible or inconsistent explanations of behavior is indicative of fraud.  Id.

Petitioner's explanations of her behavior were implausible and/or inconsistent. She testified that she lacked any financial or tax expertise whatsoever. We find that she has possessed both types of expertise since at least 1991. Two of her attorneys even testified to that effect. Beaudry testified that petitioner was very competent in financial matters and was intimately involved in the bankruptcy scheme and her plan to evade taxes. Jonathan A. Brod, another of her attorneys whom she called to testify, described petitioner as someone who thought she was financially astute and knowledgeable in tax matters. He testified that she asked him an average of 60 questions a week during the time that he represented her.

This factor weighs against petitioner.

5.   Concealing Assets

Concealing assets is indicative of fraud. Id.

Petitioner purposely undertook efforts to conceal her assets, and she purposely established the elaborate bankruptcy scheme to conceal her ultimate receipt of the income from the dermatology practice. In fact, the bankruptcy scheme continued to evolve over the years in both complexity and sophistication as petitioner asked her attorneys to hide more of her income. What was originally conceived as an attempt to defraud her creditors in bankruptcy evolved into a series of international transactions whereby petitioner attempted to avoid paying Federal taxes

altogether because, she stated, she "worked too damn hard for this money to lose it to taxes".  When her attorneys could not find a legal way to accomplish her goal, she became angry and instructed them to falsify BBL's returns so that she could underreport its income and hers.

Petitioner's handling of the Sanwa account displays yet more evidence of her fraudulent intent.  For the 3 years that the account was in existence, petitioner made not one transfer, withdrawal, or other transaction that might have brought the account to the attention of respondent.  She wrote only one check on the account for the expense of printing checks for the account.  When the account had served its fraudulent purpose, it was closed with one large transfer of funds to an offshore account.  These transactions, taken together, constitute a methodical and sophisticated attempt to conceal income and assets.

This factor weighs against petitioner.

6.  Failing To Cooperate With Tax Authorities

Failure to cooperate with tax authorities is indicative of fraud.  Id.

Petitioner has been uncooperative with both respondent and this Court as to the matter at hand.  She failed on numerous occasions to respond timely to requests from respondent.  She flouted Rule 91(f) and the Court's order of November 18, 2003,

requiring the parties to stipulate all facts and exhibits which should not fairly be in dispute. She refused to stipulate even her address or marital status until the Court questioned her on the record, and then she moved to have that stipulation set aside. She was consistently late in her filings, e.g., missing Court deadlines by weeks and months.

Petitioner's dilatory tactics and lack of cooperation cannot be excused by the fact that she was proceeding pro se. Litigants are presumed to know the tax laws and the Rules, even when proceeding pro se. See Faretta v. California, 422 U.S. 806, 835 n.46 (1975).

This factor weighs against petitioner.

7. Engaging in Illegal Activities

Engaging in illegal activities is indicative of fraud. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986).

Petitioner engaged in illegal activities to defraud respondent and her other creditors. In fact, she was convicted of five counts of bankruptcy fraud and one count under section 7201 of willfully attempting to evade and defeat the payment of $353,394 of Federal income taxes for 1983, 1984, 1986, and 1987.

This factor weighs against petitioner.

8. <u>Attempting To Conceal Illegal Activities</u>

Attempting to conceal illegal activities is indicative of fraud. <u>Id.</u>

Petitioner went to great lengths to conceal her illegal activities. Those efforts included taking part in the bankruptcy scheme, concealing her beneficial ownership in certain entities connected therewith, and using offshore bank accounts.

This factor weighs against petitioner.

9. <u>Other Considerations</u>

Petitioner is well educated and intelligent. She also is deeply involved in every aspect of her business affairs and has substantial experience with business, finance, corporations, lawyers, and accountants.

10. <u>Conclusion</u>

Our analysis above concludes that seven of the eight factors weigh against petitioner and that the remaining factor is neutral. On the basis of our detailed review of the facts and circumstances of this case, in conjunction with our analysis of the eight factors mentioned above and our "other considerations", we conclude that respondent has clearly and convincingly proven that petitioner filed her 1996 return intending to conceal, mislead, or otherwise prevent the collection of tax.

C.   Portion of Understatement Attributable to Fraud

Respondent has proven clearly and convincingly that a portion of petitioner's understatement is attributable to fraud. Thus, the whole understatement is considered attributable to fraud, except to the extent that petitioner proves otherwise.

Petitioner testified that she was the victim of her scheming attorneys, who, she says, stole the $1,149,048 at issue.  The evidence shows to the contrary; i.e., that petitioner was proactively involved in these transactions and that the $1,149,048 reached her personal accounts.  The evidence shows that petitioner sought out her attorneys to evade her payment of her prior tax debts, that she gave her attorneys a broad directive to devise a scheme that would allow her to evade paying taxes, and that she actively questioned her attorneys on the progress of the scheme.  Her own handwritten notes show that she was involved in tactical decisions such as where to send the BBL money and how to ensure its safety in transit.  Her attorneys painted a consistent picture of her as a knowledgeable and proactive participant in her financial affairs, and having seen her testify, the Court finds their testimony credible.

Petitioner is not ignorant of financial affairs.  The Court finds her testimony that she had no involvement in this scheme incredible, considering her demonstrated knowledge and her proactive demeanor at the trial.  Petitioner has failed to meet

her burden of showing that any portion of the underpayment was not attributable to fraud.

D.    Period of Limitations Under Section 6501(c)

After a return is filed, the Commissioner generally has 3 years within which to assess a deficiency in a civil tax case. Sec. 6501(a).  However, in the case of a false or fraudulent return that is filed with the intent to evade tax, the tax may be assessed at any time.  Sec. 6501(c).  Since we conclude that petitioner's 1996 return was such a return, we also conclude that the period for assessment remains open.  Id.; see also Considine v. United States, 683 F.2d 1285, 1288 (9th Cir. 1982).

III.  Judicial Estoppel

Petitioner argues that the Court should reject respondent's determination on the basis of judicial estoppel.  We disagree. Under the equitable doctrine of judicial estoppel, a court in its discretion may preclude a party from asserting a position contrary to a position that the party affirmatively persuaded that or another court to accept in the same or a previous judicial proceeding.  Huddleston v. Commissioner, 100 T.C. 17, 26 (1993); see also New Hampshire v. Maine, 532 U.S. 742 (2001); Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782-783 (9th Cir. 2001).  Factors that courts may consider in deciding whether to apply judicial estoppel include:  (1) Whether a party's later position is "clearly inconsistent" with its earlier

position, (2) whether the party has succeeded in persuading a court to accept that party's earlier position, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.    New Hampshire v. Maine, supra at 750-751.    A party requesting the application of judicial estoppel has the burden of proving that the doctrine should be applied. See Rule 142(a)(1).

Petitioner argues in her brief that respondent has taken a position that is contrary to a position taken by the United States in her criminal case.    She has not, however, persuaded us that such is so.    In her brief, petitioner does not identify with any specificity any particular position that she contends is inconsistent between the criminal case and the proceeding here. She asserts broadly that the United States argued in the criminal case that BBL was not formed for a valid business purpose and that BBL did not engage in any business activity.    Contrary to this assertion, however, the First Superseding Indictment states specifically as to the 1986 tax evasion charge that the United States' position in the criminal case was that:    (1) Petitioner operated the dermatology practice through a three-tier structure, including BBL, (2) the Bussells effectively managed and controlled BBL through nominee owners, (3) the Bussells failed to report the $1,149,048 at issue herein as income on the joint 1996

return, and (4) the Bussells had a 1996 tax due and owing to the United States.  In addition, the First Superseding Indictment indicates as to the other counts that the United States' position as to those counts did not involve nor require a finding that BBL was not formed for a valid business purpose or that BBL did not engage in any business activity.  We decline on the basis of the record before us to conclude that respondent's position here is clearly inconsistent with the United States' position in the criminal case, that respondent is a party who succeeded in persuading the criminal court to accept an earlier contrary position, or that respondent is a party seeking to assert an inconsistent position in this case and would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

IV.  <u>Section 6015 Relief</u>

Petitioner in her petition alleged as an affirmative defense that she was entitled to relief under section 6015 from joint and several liability (joint liability) as to her 1996 Federal income tax return.  See, e.g., <u>Butler v. Commissioner</u>, 114 T.C. 276, 287-289 (2000) (a taxpayer may seek relief from joint liability on a joint return by raising the matter as an affirmative defense in a petition for a redetermination of a deficiency filed under section 6213).  Spouses filing a joint Federal income tax return are generally jointly liable for the tax shown on the return or

found to be owing.  Sec. 6013(d)(3); <u>Butler v. Commissioner</u>, <u>supra</u> at 282.  In certain cases, however, an individual filing a joint return may avoid joint liability for tax (including interest, penalties, and other amounts) by qualifying for relief under section 6015.  The three types of relief prescribed in that section are:  (1) Full or apportioned relief under section 6015(b) (full/apportioned relief), (2) proportionate relief under section 6015(c) (proportionate relief), and (3) equitable relief under section 6015(f) (equitable relief).  Except as otherwise provided in section 6015, petitioner bears the burden of proving her claim for relief under that section.  See <u>Alt v. Commissioner</u>, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004); see also Rule 142(a)(1).

Petitioner neither in her petition nor in her brief specifies which of the three types of relief she is seeking under section 6015.  She alleges in her petition without further explanation that she has commenced this proceeding under sections 6015 and 6213.  She argues in her brief that she is entitled to relief under section 6015 because (1) she did not in 1996 exercise dominion and control over the funds at issue and (2) she was not aware when she signed her 1996 return that Bussell in 1996 had exercised dominion and control over those funds.  We address each of the three types of relief seriatim bearing in mind this allegation and argument.

A.    Full/Apportioned Relief

Section 6015(b) provides full/apportioned relief from joint liability on a joint return to the extent that the liability is attributable to an understatement of tax.  To be eligible for this relief, a requesting spouse needs to satisfy the following five elements of section 6015(b)(1):

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>
> (E) the other individual [timely] elects (in such form as the Secretary may prescribe) the benefits of this subsection * * *.

The requesting spouse's failure to meet any one of these requirements prevents him or her from qualifying for full/apportioned relief.  Alt v. Commissioner, supra at 313.

Respondent concedes that the requirements of subparagraphs (A) and (E) have been met and argues that petitioner does not meet the requirements set forth in the remaining three subparagraphs.  On the basis of our findings, we agree with respondent that petitioner does not qualify for full/apportioned

relief.  Contrary to petitioner's argument, we find both that the understatement as to the 1996 return is attributable to her and that she knew of this understatement when she filed that 1996 return.  We conclude that petitioner cannot carry her burden as to subparagraphs (B) and (C) and that she does not qualify for full/apportioned relief.[8]

B.    Proportionate Relief

Section 6015(c) provides proportionate relief from joint liability on a joint return.  Petitioner bears the burden of proving the portion of any deficiency which is allocable to her. Sec. 6015(c)(2).  Where petitioner had actual knowledge of the omitted income underlying the deficiency, she is not entitled to proportionate relief.  See Cheshire v. Commissioner, 115 T.C. 183 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Because we find that petitioner had direct and actual knowledge of the omitted income, we conclude that she is not entitled to proportionate relief.

C.    Equitable Relief

Section 6015(f) gives the Commissioner discretion to grant equitable relief to any individual who files a joint return and who is not entitled to either full/apportioned relief or proportionate relief.  Because we have held that petitioner is not entitled to either full/apportioned relief or proportionate

---

[8] This conclusion makes it unnecessary for us to address subpar. (D).

relief for 1996, we consider whether she is entitled to equitable relief for that year.

As directed by section 6015(f), the Commissioner has prescribed guidelines under which a taxpayer may qualify for equitable relief.  See Rev. Proc. 2003-61, 2003-2 C.B. 296.[9] Under these guidelines, a taxpayer such as petitioner must meet seven threshold conditions before the Commissioner will consider her request for equitable relief.  See id., sec. 4.01, 2003-2 C.B. at 297.  One of these conditions is that the requesting spouse not have filed the joint return with fraudulent intent. Id., sec. 4.01(6), 2003-2 C.B. at 297; cf. Rev. Proc. 2000-15, sec. 4.01(7), 2000-1 C.B. 447, 448 (same condition).  Because we find that petitioner did file her 1996 return with fraudulent intent, we conclude that she does not qualify for equitable relief.

-----------------------------------

[9] Rev. Proc. 2003-61, 2003-2 C.B. 296, superseded Rev. Proc. 2000-15, 2000-1 C.B. 447, effective for requests for relief filed on or after Nov. 1, 2003, and for requests for such relief which were pending on, and for which no preliminary determination letter had been issued as of, that date.  In that petitioner claimed in her petition that she qualified for relief under sec. 6015 and that claim was still pending on Nov. 1, 2003, we conclude that this case is controlled by Rev. Proc. 2003-61, supra.  We note, however, that our result would be the same under either of these revenue procedures.

All of the parties' arguments have been considered.  We have rejected those arguments not discussed herein as meritless.[10]

An appropriate order will be issued.

---

[10] Following the trial of this case, respondent moved the Court to impose a penalty against petitioner under sec. 6673(a)(1).  We shall resolve that motion at a later date.