T.C. Memo. 2008-264

UNITED STATES TAX COURT

THOMAS J. BARROW, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BARROW, ALDRIDGE & CO., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14551-02, 14716-02.    Filed November 25, 2008.

<u>Clarence B. Tucker, Sr.</u>, for petitioners.

<u>Alexandra E. Nicholaides</u> and <u>Kimberly Webb</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:   Thomas J. Barrow was a pioneer for African-Americans in the accounting profession, creating what was for a time the nation's largest minority-owned accounting firm. Despite his impressive leadership, Barrow ran into trouble with

the IRS when audits revealed that he was not reporting all of the business income that he received. The IRS also disallowed various deductions he took during the years at issue. Barrow was convicted at a criminal trial of filing false tax returns, bank fraud, and income tax evasion. We must decide whether Barrow and his firm are liable for tax deficiencies and associated penalties for the years 1984-89.

FINDINGS OF FACT

I. The Early Years

Barrow grew up in Detroit, graduated from high school there, and then attended Wayne State University. He majored in accounting while working as an intern for Arthur Andersen when that firm was still one of the Big Eight national accounting firms. He earned his bachelor's degree in accounting in 1971 and became a certified public accountant in 1973.

Upon graduation from college, Barrow was promoted by Andersen and he began working on financial audits. He rose through the ranks, and eventually became an experienced senior auditor. His job was to plan audit engagements, execute them, write the audit procedures, review the audit work papers, and then draft the client's financial statements to make sure they complied with Generally Accepted Accounting Principles (GAAP). He worked only on financial audits, and was never involved with

Andersen's tax department.  He also found time to continue his education by earning an MBA in finance, again from Wayne State.

II.    Formation of Barrow, Aldridge, & Co.

In March 1975, Barrow and two of his colleagues from Andersen, William Aldridge and Ron Coleman, founded their own accounting firm, named Barrow, Coleman, Aldridge & Co.  They organized it as a corporation in which each owned a one-third interest.  The firm aimed to build a client list of small businesses, individuals, and nonprofits, and it soon had a number of clients in the health-care industry.  And it didn't just do the financial audits Barrow specialized in--it also offered bookkeeping, recordkeeping, and tax-return preparation.

The firm quickly took off and, as its revenues grew, it took on more employees.  Most were CPAs, but the firm needed staff, too, and one of its first was Cynthia Nobles.  She began work in 1976, as secretary to all three partners.  Over the course of her employment at the firm, her responsibilities grew until she became both the firm's office manager and its bookkeeper.  Barrow taught Nobles some basic accounting skills, such as recording journal entries, working with a general ledger, and reconciling the bank account.  At first, he closely supervised her and was able to correct any mistakes she made.

Barrow soon emerged as the firm's star.  At first this just meant he had to work harder, because the company generally

followed the eat-what-you-kill model, with each of the senior partners working mostly for those clients that he brought to the firm. Barrow proved to be the superior rainmaker, though, and was soon bringing in far more clients than he could handle himself, shifting some of the work to the other partners. The principals began to specialize--Aldridge in tax, and Barrow on audit and financial services but with an increasing focus on client development.

When equal partners generate unequal revenues, trouble usually ensues. And in the early '80s, Barrow became dissatisfied with what he thought was the less-than-equal effort of both of his partners, but especially of Coleman. Barrow didn't feel that he had the power to fire Coleman, so he decided to leave the firm. The only problem was that the firm wanted to leave with him--the clients were predominantly Barrow's, and the employees said they would follow Barrow out the door. So Coleman decided to leave instead, and Aldridge agreed to make some adjustments so that he and Barrow could continue to work together, thus forming Barrow, Aldridge & Co. (BACO) in 1981. After the shakeup, Barrow became the majority owner with 54-percent control and was in charge of the firm's finances.

BACO, like its predecessor, had always managed its finances using the "modified cash basis of accounting." At trial, Barrow first defined the plain-vanilla "cash method of accounting" as

one where a company records revenues when it receives cash or a cash equivalent.  Likewise, a company using this method records expenses only when money goes out the door.  Barrow described the limitations of this method, saying that a company cannot account for depreciation under it.  But as Barrow explained, BACO used the modified cash method of accounting, which allowed the company to record certain expenses when all the events that surround that expense had occurred.[1]  When BACO paid its employees, for example, it would accrue and deduct the related FICA payments at that time instead of waiting to deduct those taxes when it actually paid them over to the government.

Barrow increasingly came to think of BACO as "his" firm and took it upon himself to lend it money when blips in its cashflow made meeting payroll a problem.  He did not formally approve these loans in writing on behalf of BACO, but both Aldridge and Nobles knew of them and credibly testified that they occurred.  Nobles also credibly testified that she would make journal entries in the ordinary course of business, adjusting the amount of the loans outstanding both when BACO received money and when

---

[1] BACO's tax returns had a box that required a choice of accounting method: cash, accrual or "other (specify)."  The Commissioner points out that BACO checked that it used the cash method of accounting while Barrow now claims BACO used the modified cash method.  Checking the box for cash method seems reasonable, however, given that "[r]elatively minor deviations in the form of accruals will not change the taxpayer from the basic cash method."  1 Alkire Tax Accounting, sec. 3.01[3] (LexisNexis 2007).

it paid Barrow back.  We specifically find these journal entries a generally reliable record of Barrow's loans to BACO and their repayment.

BACO required all employees and owners to abide by a noncompete agreement.  Barrow testified that it was BACO's policy "that if it [was] a service that [BACO] offer[ed]," then a BACO employee couldn't "perform that service outside of the firm's purview."  Donna West, initially a BACO audit manager and later a principal, credibly testified that she knew that this was BACO's policy even though she never saw it in writing.  She explained that she "would not have been able to work for a competitor" because "as a CPA [she] would not work for one of the other accounting firms."  She also explained that she could work in-house for a client, but that under the policy she would still be a BACO employee receiving her compensation from BACO.

III. Complete Information Systems

The second business whose finances are at issue in this case is Complete Information Systems (CIS).  Started in 1979 by BACO's principals, CIS leased mainframe time which it resold to its clients.[2]  That time would then be available for BACO clients to automate their bookkeeping.  Barrow completed all the paperwork

---

[2] In those bygone days before personal computers became a commodity, companies could actually make money by buying time on a mainframe computer wholesale and reselling it to clients.  For the various uses (or the misuses) of the term "time sharing", see Odeneal, Computer Time Sharing for Managers 17 (1975).

to set up CIS, and at first all the partners of Barrow, Coleman, Aldridge & Co. owned it, but with the understanding that distributions from revenues would be unequal and dependent on who brought the client in. All the clients of CIS were also clients of BACO, and the partners would routinely try to cross-sell the services of both firms.

Over time, CIS also began to lease cars to BACO's owners. Barrow signed the lease agreements for CIS, and Aldridge and Nobles signed for BACO. After the shakeup from which BACO emerged, Barrow became the sole proprietor of CIS, though Nobles continued to do its bookkeeping. For tax years 1984, 1985, 1987, and 1988, Barrow called this business CIS or CIS Leasing; on his 1986 tax return, Barrow called it "BARCO leasing." For all of these tax years, Barrow reported its business income and expenses on his own Schedule C, using the cash method of accounting, under which he recorded CIS's income and expenses in the calendar year in which they occurred.

IV. BACO's Success and Barrow's Community Involvement

BACO continued to grow, and in 1981 it opened a satellite office in Illinois. The firm also negotiated a deal with Coopers & Lybrand that was essentially a right of first refusal. If BACO wanted to partner with a large accounting firm, it had to ask Coopers first, and likewise if Coopers wanted to partner with a minority-owned firm. This agreement gave BACO access to large

clients that it would not have otherwise been able to work with. Barrow negotiated this joint venture, and it was the first of its kind among accounting firms in Detroit. Barrow successfully increased the client base of the BACO satellite offices by marketing his experience and learning to manage client relationships remotely.

In an effort to bring in new clients and to raise his stature in both the business and financial communities, Barrow became active in many professional associations. He was the Detroit chapter president for the National Association of Black Accountants (NABA), which became the largest chapter in the country under his leadership. He later became the national NABA president, and in that role he visited many U.S. cities to organize additional chapters. He served on an advisory board to the Commissioner of Internal Revenue, and the governor of Michigan appointed him to the State Board of Accountancy, which he eventually chaired. He was also a member of the Accounting Aid Society of Metropolitan Detroit, and was on the advisory board to the Small Business Association and the Advisory Council of the Wayne State University Department of Accounting.

But the community involvement that plays the biggest role in this case began with Barrow's appointment to the board of

trustees for New Center Hospital[3] (NCH) in 1981. NCH was a troubled institution, as Barrow quickly discovered after he arrived. This prompted him to start asking tough questions of Alan Weiner, the hospital's executive consultant. Weiner reacted by trying to find ways to decrease the strength of the hospital board, but Barrow led a countercoup in 1984 in which the board ousted Weiner, and elected Barrow as chairman of NCH.

Barrow's prominence and reputation in Detroit was growing. But 1985 proved to be its apogee. That year, Barrow decided to heed the urging of his friends and run for mayor of the city against the formidable incumbent Coleman Young. He believed--and we specifically find his claim of naivete credible--that this would simply mean putting his name on the ballot and campaigning for awhile. Instead, it began a long downward slide in his personal and financial fortunes.

The first sign was neither subtle nor long in coming--BACO's largest client in 1985 was the City of Detroit, and the City swiftly decided to cut off its business with the firm, leaving BACO with a huge revenue shortfall. But there were also subtler effects. As Barrow grew more occupied with politics and community work, he did not have the time he needed to supervise

---

[3] At the time, New Center Hospital was named Detroit Center Hospital. The board decided to change the name in 1984 because Detroit Center Hospital had a poor image in the community.

Nobles adequately.  Mistakes she made in recording entries in the books of both BACO and CIS remained uncorrected and leached into Barrow's and BACO's tax returns.

Many of the problems that led to this case, though, began with Barrow's work on the NCH board.  His duties started out as routine trustee chores--attending meetings and cursorily reviewing Weiner's proposals.  But after Weiner's ouster, Barrow and the hospital board decided in 1985 to seek outside advice, which led them to put the hospital and some affiliates under a holding company.  This new company, called Central Cities Health Services (CCHS), with Barrow as chairman of its board of directors, planned to acquire clinics throughout Detroit.  These clinics could refer patients needing specialized or acute care to the hospital, giving its patient population a much-needed boost.  He also increased his efforts at the hospital while running for mayor that year--in fact, the then-chairman of CCHS stepped down and let Barrow take his place because he knew it would be valuable for Barrow's mayoral campaign.

Barrow stayed on the hospital's board, too, and was the only director common to both NCH and CCHS.  The two boards began paying their members a fee of $100 for each monthly board meeting attended, and $50 for each subcommittee meeting.  They also paid Barrow a separate annual chairman's fee of $4000.  CCHS's plan began to work, and it became the parent company of New Center

Clinic-East, New Center Clinic-West, and New Center Clinic-Central.

The NCH board of trustees hired a chief operating officer. The new man was to run the hospital's billing, personnel, and patient care departments, but after a couple years it became obvious that he didn't know how to run the financial side of the hospital. The result was a cashflow problem serious enough to prompt the board to remove him.

By then, NCH was collecting substantially less than what it was billing. Some insurance companies and Medicaid were refusing to pay bills because of avoidable paperwork problems, but instead of correcting and resubmitting the bill, the billing department did nothing. The result was a perpetual cash crisis. The board also discovered that the hospital had a mortgage with HUD on which it was not current, which then triggered violations of NCH's corresponding regulatory agreement connected to that mortgage. And, to add to the hospital's woes, it also had a payroll-tax problem because it hadn't been paying over withheld taxes to the IRS.

Sometime between 1985 and 1988, CIS began providing computer services to NCH. These services included aiding the hospital with its billing system. It's unclear whether and to what extent Barrow disclosed his ownership of CIS--a potential conflict of interest--to the other board members. But Barrow credibly

testified on this tangential point that every board member did business with the hospital and its affiliates.

Barrow understood the hospital's financial problems and, so he began to get more involved in the hospital's day-to-day operations. In September 1987, while still a partner at BACO, Barrow began functioning as a full-time manager to try to bring order to the chaos in the hospital's financial departments. The board agreed in exchange to pay Barrow the same $52,000 (as a chairman's fee) that the previous chief operating officer had received as salary.

Between February 1986 and late 1987, NCH signed two deals with BACO. The first was a professional compilation-accounting services agreement, a service that BACO routinely performed for its clients. After receiving bids for contracts from other accounting firms that the hospital couldn't afford, BACO essentially "lent" some of its employees at reduced rates to NCH to help with the billing and finances. These employees acted like NCH employees--they worked at NCH every day, and they were actively involved in reconciling the bank accounts, building and maintaining relationship with the hospital's vendors, and creating the quarterly requests for reimbursement from Medicare, Medicaid, and Blue Cross Blue Shield. NCH paid BACO directly, and BACO deposited this money into BACO checking accounts. Donna

West was the lead on this engagement, and Barrow's work on this project did not extend beyond supervising her.

In September 1987, at about the time that Barrow took on his greatly expanded role in managing the hospital, BACO started the second engagement, which was to reconstruct cost reports, business records, and other accounting records back to the 1970s. This project was much more complex:  The money at risk amounted to several million dollars and the hospital's survival was at stake.  Barrow got personally involved, but since the hospital paid him a chairman's fee, he did not have BACO bill NCH for his time.  Barrow's involvement on this engagement came within the penumbra of the noncompete agreement, and he admits that the fee paid to him as NCH's chairman should have belonged to BACO under that agreement.[4]

All during these years that he was spending so much time at CCHS and NCH, Barrow continued to have several outstanding loans with BACO.  He would often deposit checks from BACO's clients that were payable to BACO into his own personal account.  On this important point we specifically find, based on the testimony and exhibits in evidence, that Barrow had Nobles record in the BACO general ledger upon receipt of each check a journal entry that decreased the loan payable to him (a debit) and increased BACO'S

---

[4] There was also a draft agreement between CCHS and BACO for similar consulting services, but the parties never signed the agreement or acted upon it.

revenues from the engagement (a credit).  The only check not properly recorded in the BACO ledger was one for $8,352 from Ernst & Whinney.

During this time, Barrow was still receiving a board stipend from NCH in addition to his chairman's fee.  Barrow credibly testified that there was a substantial difference between his role as NCH chairman and his role as NCH board member.  He received the NCH board stipend for attending and conducting meetings, and considered it (like the other board stipends and the CCHS chairman's fee) to be his own income.  The hospital consistently paid BACO and Barrow, although not all the other vendors, and for a time Barrow himself managed the hospital's cashflow by approving all payments before they were sent to the vendors.  This gave him a very detailed knowledge of the state of NCH's cash position, and he would sometimes refrain from cashing his board stipend or chairman's fee checks because he knew the hospital didn't have the cash on hand to pay him.

While occupied at the hospital and CCHS, Barrow also had to deal with another outbreak of change at BACO--Aldridge's decision to leave the firm in December of 1987.  Even though Barrow had been president of BACO from its start, Aldridge's departure left him with near total responsibility over administrative and financial decisionmaking.  It also left him--with the exception of some partners who owned about 3 percent of the firm's

outstanding shares--as the firm's owner.  Even more than before, BACO's fate depended on Barrow.

V.    Personal and Professional Trouble

Despite all his responsibilities, Barrow chose to run for mayor again in 1989.  This second campaign was especially brutal because Barrow was by then a legitimate threat to the incumbent mayor.  Calling his mayoral run "life-altering," Barrow experienced things he only thought happened in fiction, credibly testifying that someone broke into his home and stole only his briefcase.  And that he found someone pulling documents from his trash.  And that police began to sit outside his home to observe who was coming and going.

The 1989 campaign began to founder after the Detroit Free Press ran a series of articles about Barrow, BACO, CIS, and their connections with NCH.  Because NCH consistently paid BACO and Barrow but not its other vendors, the paper questioned whether Barrow had a conflict of interest.  On one occasion, a reporter at the paper called Barrow and asked whether he had ever received payment from NCH for his services.  Barrow lied and said that he had not.  And even though he thought no one would ever find out, he stamped the back of his chairman's-fee checks, which he had already deposited into his personal account, with the BACO endorsement stamp.  Barrow also kept quiet about the ownership of CIS--Joseph Valenti, a friend of Barrow's and fellow hospital

board member, testified credibly that even he didn't know CIS and Barrow were connected until a reporter did an investigative piece on Barrow during the campaign.

Barrow lost his run for the mayoralty and then lost a race for Congress in 1990. He resigned from the NCH board in July 1990, and pulled the BACO staff out of the engagement with the hospital at that time as well.

VI. The Collapse: Audit and Criminal Trial

In September 1989, IRS Agent Stephen Bulik began investigating BACO's tax return for the year ending March 31, 1988. One of the first things he did in his audit was to reconcile the general ledger to the tax return. Many of the general ledger accounts did not agree. The audit soon expanded to BACO's tax year ending March 31, 1989, and to Barrow's personal taxes for 1984 through 1988.

Because Bulik was not able to reconcile the return to the general ledger, he began a specific-items analysis[5] for both BACO and Barrow personally for all years at issue. Bulik performed a bank-deposits analysis to determine the CIS portion of Barrow's understatement.

---

[5] A specific-items analysis is a direct method of proof used when an IRS agent can find a taxpayer's sources of income. (When the IRS can't find a taxpayer's sources of income, it uses an indirect method of proof such as an analysis of bank deposits.) See generally Garbis et al., Tax Procedure and Tax Fraud 618 (3d ed. 1992).

After years of investigation and a referral from the civil to the criminal side of the IRS, a grand jury indicted Barrow in October 1993 on one count of bank fraud, one count of making false statements on a loan application, five counts of tax evasion under section 7201 for tax years 1984 through 1988, and five counts under section 7206(1) of willfully submitting false tax returns for tax years 1984 through 1988.[6]  Barrow was also indicted on three counts of willfully submitting false corporate tax returns on behalf of BACO for tax years 1987 through 1989.

During the criminal trial, the government pursued a theory that Barrow had cheated on his taxes by not reporting on his individual returns the fees that NCH and CCHS paid to him as the chairman of the board and a trustee.[7]

_____

[6] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court's Rules of Practice and Procedure.

[7] Neither party chose to introduce the transcript of the criminal trial into evidence.  Cf. Oliver v. Commissioner, T.C. Memo. 1993-508 (where we allowed admission of a transcript from the criminal trial and held that we had discretion in deciding the weight to afford testimony of the taxpayer and other witnesses at the criminal trial); but see Costa v. Commissioner, T.C. Memo. 1990-572 (where we disallowed admission of an affidavit from the criminal trial since it wasn't made under Fed. R. Evid. 801(d)(1)).  We therefore rely where relevant on the indictment (which was introduced), credible testimony in this case of what happened in the criminal case, and the concessions of each party.  Barrow did include massive excerpts from the criminal trial transcript in his posttrial brief.  Rule 143(b), however, says that statements in briefs are not evidence.  And we have previously held that parties cannot attempt to supplement

(continued...)

In 1994, a jury convicted Barrow on eight of the twelve counts against him:

- Making false statements in connection with a bank loan application under 18 U.S.C. 1014;

- Bank fraud under 18 U.S.C. 1344;

- Income tax evasion for tax years 1985, 1987, and 1988 under section 7201; and

- Willfully filing false income tax returns for years 1985, 1987, and 1988 under section 7206(1).

Barrow was also convicted under section 7206(1) for willfully filing a false corporate income tax return for BACO in tax years ending March 31, 1988 and 1989.

## VII. <u>Barrow and BACO Tax Returns</u>

Barrow would collect all of the yearend adjusting entries and the calculated ending balances for each of the general ledger accounts. Then Aldridge (at first) or Barrow (after Aldridge left) would prepare BACO's tax returns. Both Barrow and BACO routinely filed their returns late during the years 1984-1989. Just as often, the returns were later amended after Barrow discovered reporting mistakes made by Nobles or remembered income or expenses that he had previously been too busy to write down.

---

[7](...continued)
the record with new material provided in the post-trial briefs. See <u>Snyder v. Commissioner</u>, 93 T.C. 529, 533 (1989); <u>Hartford v. Commissioner</u>, T.C. Memo. 1995-351. We therefore do not use that information in reaching our decision.

| Barrow's Personal Income Tax Returns | | |
|---|---|---|
| Tax Year | Form | Date Filed |
| 1984 | 1040 | 7/13/87 |
| 1985 | 1040 | 1/11/88 |
| 1986 | 1040<br>1040X<br>1040X | 1/14/88<br>2/04/88<br>4/10/90 |
| 1987 | 1040<br>1040X | 12/29/89<br>1/10/90 |
| 1988 | 1040 | 1/10/90 |

| BACO's Income Tax Returns | | |
|---|---|---|
| Fiscal Year Ending 3/31 | Form | Date Filed |
| 1988 | 1120<br>1120<br>1120X<br>1120X | 7/18/88<br>9/20/89<br>1/10/90<br>4/10/90 |
| 1989 | 1120<br>1120X | 10/04/89<br>4/10/90 |

VIII.   The Civil Trial

The IRS began a civil examination of Barrow and BACO in 1998.  After several years of investigation, the Commissioner sent notices of deficiency to Barrow for tax years 1984 through 1988, and to BACO for tax years ending March 31, 1988 and 1989. The Commissioner determined deficiencies arising from the following unreported income:

| BACO's Unreported Income | | | | | |
|---|---|---|---|---|---|
| Year | NCH | CCHS | NCC-W | NCC-E | Ernst & Whinney |
| 1988 | $63,955.66 | $64,811.55 | --- | --- | |
| 1989 | 63,513.66 | 54563 | $4,500 | $9,000 | $8,352 |

| Barrow's Unreported Income | | | |
|---|---|---|---|
| Year | Bank-Deposit Method | Portion Due to BACO Distributions | Portion Due to Wages |
| 1984 | $107,337.34 | $7,694.07 | $76,015.84 |
| 1985 | 4,410 | 14,600 | --- |
| 1986 | 92,457.05 | 70,232.58 | --- |
| 1987 | 27,176.08 | 121,965.16 | --- |
| 1988 | 137,237.15 | 167,271.27 | --- |

Instead of attributing the NCH and CCHS fees to Barrow personally, the Commissioner now argues that they belonged to BACO, and that Barrow diverted them by depositing them into his own personal checking account. The Commissioner treats this income and diversion for tax purposes as income to BACO, followed by a constructive dividend to Barrow. Even though the government now believes this is the proper way to treat the fees, it used a completely different theory at Barrow's criminal trial--an important change, as it will turn out.

The Commissioner also disallowed several deductions. Some of these were expenses connected with Barrow's plane. Because he

traveled so often to meet with clients spread throughout Michigan and Illinois, and to visit various other cities for his work with NABA, Barrow--an instrument-rated pilot--had begun flying himself to save time. The FAA requires pilots to keep a logbook of all their flights and to record the purpose of each. But during the initial audit, Barrow gave the logbook to the IRS without making a copy. The IRS lost it, and Barrow was unable to reproduce its content.

Both Barrow and BACO petitioned this Court for relief. The main issues for decision are:

- Did Barrow or BACO engage in fraud, thereby tolling the 3-year statute of limitations?

- Does collateral or judicial estoppel bar any claims or issues in this case?

- Did Barrow or BACO understate income?

- May Barrow or BACO take the income tax deductions disallowed by the Commissioner?

- Is Barrow or BACO liable for the fraud penalty under former section 6653(b)(1)?

Barrow resided in Detroit throughout the events of this case, including the day he filed his petition. BACO is now a defunct corporation originally headquartered in Detroit.[8]

---

[8] Michigan law provides that a dissolved corporation "may sue and be sued in its corporate name and process may issue by and against the corporation in the same manner as if dissolution had not occurred." Mich Comp. Laws Serv. sec. 450.1834(e) (Lexis-Nexis 1973); see also id. sec. 450.1833; Freeman v. Hi Temp Prods., 580 N.W.2d 918, 921 (Mich. Ct. App. 1998).

OPINION

I.   Fraud

This case hinges on whether Barrow committed fraud.  On this question hangs the Commissioner's ability to redetermine Barrow's and BACO's deficiencies for 1984-89, because the Commissioner generally has only three years after a taxpayer files a return to assess a deficiency or issue a notice of deficiency.  Sec. 6501(a).  Barrow filed all original personal and business returns for the years in question by the end of 1990,[9] but the Commissioner waited until 2002 to send notices of deficiency.  Barrow urges us to apply the three-year statute of limitations, but the Commissioner points us to section 6501(c)(1), which says that

> [i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

---

[9] We look to the date that Barrow filed the original returns, not any amended returns, in applying section 6501(c)(1). Badaracco v. Commissioner, 464 U.S. 386, 394 (1984),("[O]nce a fraudulent return has been filed, the case remains one 'of a false or fraudulent return,' regardless of the taxpayer's later revised conduct, for purposes of * * * civil fraud liability under section 6653(b).  It likewise should remain such a case for purposes of the unlimited assessment period specified by section 6501(c)(1).").

Whether we get to decide the merits of each year depends on the success of his assertion.

Fraud is an intentional wrongdoing, and the Commissioner must prove by clear and convincing evidence that Barrow specifically intended to evade a tax that he believed he or BACO owed "by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes."  See Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); accord, Wright v. Commissioner, 84 T.C. 636, 639 (1985).  We look to Barrow's actions to determine whether any BACO underpayment resulted from fraud because "corporate fraud necessarily depends on the fraudulent intent of the corporate officers."  DiLeo v. Commissioner, 96 T.C. 858, 875 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  We do not impute or presume fraud--the Commissioner must prove that:

- there is an underpayment of tax for each year at stake; and

- some part of that underpayment is due to fraud.

Sec. 7454(a); Rule 142(b); Wright, 84 T.C. at 639.

A.  Underpayment

To prove an underpayment, the Commissioner can use methods different from those the taxpayer used to calculate income when the taxpayer's method of accounting doesn't clearly reflect income.  Sec. 446(b); Parks v. Commissioner, 94 T.C. 654, 658

(1990).  Barrow has the burden to prove that the Commissioner's determination of unreported income is unfair or inaccurate. DiLeo, 96 T.C. at 871; Parks, 94 T.C. at 658.

The Commissioner argues that Barrow underpaid his personal tax liability for tax years 1984-88, and that Barrow caused BACO to underpay its tax due in 1988 and 1989.  We need not delve into the details in this part of our opinion, because Barrow concedes at least some underpayment for 1984 (due to using the wrong Form W-2), and 1985 (due to a missing Form 1099 for CCHS income).  We have also held that a taxpayer admits an underpayment by filing an amended return that increases his tax liability.  Badaracco, 464 U.S. at 399; Delvecchio v. Commissioner, T.C. Memo. 2001-130, affd. 37 Fed. Appx. 979 (11th Cir. 2002).  That's just what Barrow did for 1986 when he filed a Form 1040X for 1986 that showed an increase in tax liability.  We therefore find with little difficulty that Barrow had at least some underpayment in 1984, 1985, and 1986.

Whether an underpayment existed for 1987 and 1988, and for BACO in 1988 and 1989, is a more difficult question.  Barrow did file an amended return for 1987--but it *decreased* his tax liability by $28,750.  BACO's 1988 and 1989 amended returns show no increase in tax liability because of the availability of net-operating-loss carryforwards.  So we can't use these amended returns as admissions.

But we can use the fact that he filed all four of these returns late.  The version of section 6653(c)(1) effective for Barrow's 1987 and 1988, and BACO's 1988 and 1989, returns states that

> For purposes of this section, the term "underpayment" means * * * a deficiency as defined in [section 6211] (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return * * *

And for purposes of section 6653(c)(1), "'a taxpayer will automatically create an "underpayment" in the amount of the correct tax simply because he * * * files an untimely return.'" Campbell v. Commissioner, T.C. Memo. 1997-415 (quoting Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990)).  This means that, to answer the question of whether the Commissioner has proven that there were underpayments for the 1987, 1988, and 1989 tax years, we can simply look to see if Barrow reported any nonzero tax due for those years.  See sec. 301.6653-1(c)(1)(ii), Proced. & Admin. Regs.  Even if Barrow contests the Commissioner's deficiency, a late-filed return is an admission that one owes at least the amount of tax shown due on it, making it an admission of underpayment.  And even if we assumed the accuracy of the tax reduction shown on the amended 1987 return, Barrow would still be deemed to have admitted that he owed some tax for 1987.  We therefore conclude that there was

at least some underpayment as defined in section 6653(c)(1) for Barrow in 1987 and 1988.

The Commissioner can find no comfort in this reasoning for the BACO returns in this case. BACO's original returns for 1988 and 1989 show zero tax liability because of a net-operating-loss carryforward that eliminates any tax that would've otherwise been due. The notice of deficiency for these years recalculated and reduced the net operating loss available for 1988 and 1989, and included Barrow's hospital board fees and chairman's fees in BACO's income during those years. This created a tax deficiency, and as we said above, an underpayment for purposes of section 6653(c)(1) includes a deficiency as defined in section 6211. Rather than make findings on the merits that an underpayment exists, we move along to the second part of the fraud test for these two years as well.

B.   Collateral Estoppel, Judicial Estoppel, and
     BACO's Noncompete Policy

Before deciding whether Barrow had the required fraudulent intent, we must first consider whether we need to decide the question at all. Each party vigorously argued that the other is estopped on the issue.

We'll start with the Commissioner. He contends that Barrow is collaterally estopped from contesting that he had the required fraudulent intent when he filed his 1985, 1987, and 1988 returns, because he was convicted for criminal tax evasion under section

7201 for those years. The Commissioner is right that a conviction under section 7201 for tax evasion necessarily carries with it the factual determination that some part of the resulting deficiency was due to fraud, and as a general rule we collaterally estop a taxpayer from arguing any defenses to the civil fraud penalty for the same year. Niedringhaus, 99 T.C. at 214; see also Gray v. Commissioner, 708 F.2d 243, 246 (6th Cir. 1983), affg. T.C. Memo. 1981-1. It's possible, however, that the Commissioner's procedural missteps bar him from succeeding on this argument.

The possible misstep here is that we require a party asserting an affirmative defense--here, collateral estoppel--to raise the issue in his pleading. Rule 39. The Commissioner didn't do that. He argues, however, that there was implied consent because Barrow didn't object to his collateral-estoppel defense at trial, and Rule 41(b)(1) says that when an issue is tried by express or implied consent, we are to treat the issue as if it was raised in the pleadings. In Pierce v. Commissioner, T.C. Memo. 2003-188 [citations omitted], our Court held that this rule applies to collateral estoppel.

> [I]n deciding whether to apply the principle of implied consent, [we have] considered whether the consent results in unfair surprise or prejudice toward the consenting party and prevents that party from presenting evidence that might have been introduced if the issue had been timely raised.

In <u>Estate of Huntsman v. Commissioner</u>, 66 T.C. 861, 871-72 (1976), we held that there was no implied consent where the taxpayer had no notice of the Commissioner's tardy argument, the Commissioner didn't raise the issue at trial, and we found that the taxpayer had no opportunity to defend against the Commissioner's claim.

Barrow's case is different. The Commissioner raised the issue in his pre-trial memo, putting Barrow on notice of his collateral-estoppel defense. Barrow does argue that the Commissioner never filed a posttrial motion to conform the pleadings to the proof presented, and therefore we should bar the Commissioner from relying on collateral estoppel now. But Rule 41(b)(1) says that

> The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues, but *failure to amend does not affect the result of the trial of these issues*.

(Emphasis added). We therefore will address the collateral-estoppel issue on its merits.[10]

We use collateral estoppel to prevent parties from litigating issues that were necessarily decided in a prior suit.

---

[10] Barrow also argues that he notified our Court at trial of the Commissioner's failure to raise collateral estoppel as an affirmative defense. He cites the trial record in one of his post-trial briefs, but his citation is incorrect.

Peck v. Commissioner, 90 T.C. 162, 166-67 (1988), affd. 904 F.2d

525 (9th Cir. 1990).  There are five conditions:

- The issue in the second suit must be identical in all respects with the one decided in the first suit.

- There must be a final judgment rendered by a court of competent jurisdiction.

- Collateral estoppel may be applied against parties and their privies to the prior judgment.

- The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

- The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

Both parties agree that this case meets the second and third

conditions:  the District Court in the criminal case rendered a

final judgment and the parties to each case are the same.[11]

Because they contest the remaining criteria we analyze them, in

turn, for 1985, 1987, and 1988.

### 1. Are the Issues Identical in All Respects?

The Commissioner simply asserts that the issues in each case

are the same.  Niedringhaus, 99 T.C. at 217 ("'willfully' as used

---

[11] The Commissioner limits his estoppel argument to the three years in which Barrow was individually convicted of tax evasion under section 7201.  We've previously held that a corporation--even if it's closely held--that was not a part of the criminal case cannot be collaterally estopped from denying fraud based on a majority shareholder's conviction for tax evasion.  C.B.C. Super Mkts., Inc. v. Commissioner, 54 T.C. 882, 894 (1970).

in section 7201 encompasses all the elements of fraud which are envisioned in section 6653(b)").  But Barrow says the issues are different because the Commissioner uses a new theory of corporate diversion, a position that he says contradicts the theory of personal income-tax evasion the government used in winning the criminal case.  Barrow argues that the new theory was not before the jury in the criminal case and that, if it had been, the government would have had to prove at that trial both that (1) the income belonged to BACO and (2) Barrow deliberately diverted the income to himself.  Because these issues weren't considered at the criminal trial and Barrow never had a chance to challenge them there, Barrow says that collateral estoppel cannot apply.

The government admits that its theory is different in this case from what it argued in the criminal case:

> In the criminal case, the United States presented to an unsophisticated jury that the unreported income was the direct income of Thomas J. Barrow * * *.  By doing so, the United States cast the clearest presentation of the facts to the jury so as to avoid any confusion the jurors may have had with the concept of double taxation.  In the instant case, [the Commissioner] introduced sufficient evidence to show that the income was also the corporate earnings of [BACO,] therefore adding the double tax component that was omitted in the criminal case.  In both instances, the income is attributable to [Barrow].

Reply Brief for Respondent at 5.  In other words, the government successfully persuaded the District Court jury in the criminal case to find that all of the unreported income was directly

received by Barrow.[12]  The Commissioner argues that this direct-income theory is consistent with his corporate-diversion theory because in both cases, the income is taxable to Barrow.  The Commissioner says he is simply adding another layer by determining that the income is also taxable to BACO.[13]

Even though we agree with Barrow that the government's position has changed between the criminal case and this one (as we explain later in discussing judicial estoppel), there are relatively minor items of unreported income or incorrect expenses whose consequences for Barrow's tax liability are unaffected by the switch in government theories between the cases.  At the criminal trial, the government had the burden to establish willful tax evasion beyond a reasonable doubt.  Because the jury didn't have to return a verdict detailing which items of income Barrow hadn't reported or which items of expense he hadn't

---

[12] Recall that the government had to prove an underpayment in the criminal case.  But the government wasn't required to prove the specific amount of the underpayment, just that an underpayment of tax existed.  See Moore v. United States, 360 F.2d 353, 356-57 (4th Cir. 1965); Wapnick v. Commissioner, T.C. Memo. 1997-133.

[13] Corporations are subject to double taxation because the Code taxes income first when the company receives it and then again when the company distributes it to its shareholders.  See Prescott v. Commissioner, 66 T.C. 128, 138 (1976), affd. 561 F.2d 1287 (8th Cir 1977).  For a historical account of the development of double taxation, see Bank, "Is Double Taxation a Scapegoat for Declining Dividends? Evidence From History", 56 Tax L. Rev. 463, 479-516 (2003).

substantiated, we have no way of figuring out any precise deficiency from the judgment in the criminal case. We do know that the Commissioner's burden to prove fraud here by clear and convincing evidence is a lower standard than the U.S. attorney's burden of proving Barrow's willful evasion beyond a reasonable doubt. And we know from the jury's verdict that at least some part of Barrow's underpayment for 1985, 1987, and 1988 is attributable to fraud. We have also previously stated:

> it is now well settled that the criminal judgment of conviction requires application of the doctrine of collateral estoppel and that * * * at least part of any underpayment for the prosecution years must be deemed already to have been judicially determined to be "due to fraud" within the meaning of section 6653(b).

C.B.C. Super Mkts., 54 T.C. at 893; see also Rodney v. Commissioner, 53 T.C. 287, 305 (1969). Because a portion of the deficiencies that were at issue in the criminal case remains at issue in this case, we cannot say that the fraud issue as it related to the individual deficiencies is different.

2. Did the Parties Actually Litigate the Issues and Was There a Resolution Essential to the Prior Decision?

The issue of whether or not Barrow evaded tax was litigated in the criminal case. The jury agreed with the Government that Barrow evaded tax in 1985, 1987, and 1988. Because we have held that a conviction for evading tax decided the issue of whether some part of Barrow's underpayment was due to fraud, we agree

with the Commissioner that the parties actually litigated the issue and there was a resolution in the Government's favor.

3.    Have the Controlling Facts and Applicable Legal Rules Remained Unchanged From Those in the Criminal Case?

The applicable legal rules remain unchanged--both criminal tax evasion and civil tax fraud require proof of an underpayment. Sec. 7201; United States v. Heath, 525 F.3d 451, 456 (6th Cir. 2008); Niedringhaus, 99 T.C. at 210.  The controlling facts relevant to Barrow's criminal tax evasion are also the same as those the Commissioner argues apply in this case--at least with regard to part of Barrow's individual income-tax deficiency not attributable to the new theory of corporate diversion.  And there are no new facts that weren't available to the parties in the criminal case.  Barrow urges us to consider Boulware v. United States, 552 U.S. __, 128 S. Ct. 1168 (2008), as a change in the applicable legal rules sufficient to defeat the application of collateral estoppel.[14]  Boulware held that a shareholder in a criminal tax evasion case can claim that distributions from his company were a return of capital, without producing evidence that he or the company intended this type of distribution.  Id.  But

---

[14] On April 15, 2008, Barrow filed a motion asking us to take judicial notice of Boulware, a motion which in effect allowed him to cite supplemental authority for his case.  We asked for a response from the Commissioner, in which he correctly argued that the proper venue for deciding the impact of the Boulware decision is District Court.

the Commissioner is correct in asserting that the theory pursued by the government in Barrow's criminal case didn't involve this issue.

We therefore collaterally estop Barrow from denying fraud for tax years 1985, 1987, and 1988. This means we can redetermine Barrow's tax liability for those years. The Commissioner, however, must still prove fraud for Barrow's individual income tax in years 1984 and 1986, an issue that we analyze below in redetermining the deficiency for all five years.[15]

The Commissioner is not alone in urging estoppel. Barrow, too, raises the issue. But the theory he argues for is judicial estoppel. Judicial estoppel is a doctrine that prevents a party from winning judicial acceptance of a theory in one case, only to pursue a contradictory theory later. New Hampshire v. Maine, 532 U.S. 742, 749 (2001); Fazi v. Commissioner, 105 T.C. 436, 445 (1995) (citing Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993)). The rule's purpose is to "protect the integrity of the judicial process ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. at 749-50 (citations and quotation marks omitted). "Judicial estoppel does not bar a party from contradicting itself, but from contradicting a court's

---

[15] Because we have found no underpayment for BACO, see infra p. 50, we need not consider whether its 1988 and 1989 returns were fraudulent.

determination that was based on that party's position."  Teledyne

Indus., Inc. v. NLRB, 911 F.2d 1214, 1217 n.3 (6th Cir. 1990).

This doctrine generally requires us to accept the earlier of

the two inconsistent positions.  Huddleston, 100 T.C. at 26.

Factors that may lead us to judicially estop the Commissioner

from adopting a new position in this case include, but are not

limited to, the following:

- Is the government's later position "clearly inconsistent" with its earlier one?

- Did the government succeed in persuading the criminal court to accept its earlier position?

- Would the Commissioner derive an unfair advantage or impose an unfair detriment if not estopped?

Maine v. New Hampshire, 532 U.S. at 750-51; Bussell v.

Commissioner, T.C. Memo. 2005-77, affd. 262 Fed. Appx. 770 (9th

Cir. 2007).  It's Barrow's burden to show that the government

took a contrary position in a prior proceeding and that this

position was accepted by the court.  Teledyne Indus., 911 F.2d at

1218.  Barrow has easily borne this burden by pointing to the

Commissioner's rather startling admission that the government

changed theories because it didn't think the jury was smart

enough to understand what he now says really happened--the

diversion by Barrow of money owed to BACO.

The Commissioner says he's merely adding the double tax

component to the previous determination.  We disagree.  The

government's positions in the two cases are inconsistent because the corporate-diversion theory doesn't simply increase Barrow's deficiencies, it changes both the nature of the income and the computation of the tax owed by both BACO and Barrow.

We find this case similar to Warda v. Commissioner, 15 F.3d 533 (6th Cir. 1994), affg. T.C. Memo. 1992-43, in which a taxpayer argued in a will contest case that she was the owner of certain real estate and in a later tax case argued that her son was the owner, in order to claim that the transfer of real estate to her son was a tax-free gift. The appeals court determined that the outcome of the earlier case turned on the question of the property's ownership--the taxpayer benefiting from being the owner in the first case--so that her change in theory represented a "knowing assault on the integrity of the judicial system." Id. at 539 (citation and quotation marks omitted). Although we won't accuse the IRS of trying to "assault *** the integrity of the judicial system," it remains true that IRS witnesses helped convict Barrow with the simple story that he was receiving income directly from NCH and CCHS that he didn't report on his income tax returns and are now trying to help the IRS win by testifying that Barrow was really taking money from his firm that wasn't owed to him personally--a theory that would allow the Commissioner to tax BACO on that income and then tax Barrow again on what the government now calls dividends. We should probably

be flattered that the Commissioner thinks us more intelligent than the jury, but we hold that such flattery only gets him estopped here.

We also hold, in the alternative, that money Barrow earned from his hospital chairman's fees was not actually a "corporate diversion." The Commissioner argues that all compensation Barrow earned from his relationship with the hospital should be taxed as corporate income because BACO's noncompete policy allowed BACO to claim as corporate income any compensation earned by BACO employees performing competing services. The Commissioner offers little explanation for why money that never reached BACO, and to which BACO never had unfettered access, should nonetheless have been claimed on BACO's corporate tax return rather than Barrow's individual return.

The problem with this argument is that BACO's noncompete policy appears to be, in the words of Captain Barbossa, "more what you'd call guidelines than actual rules." Pirates of the Caribbean: The Curse of the Black Pearl (Walt Disney Pictures 2003). The trial exhibits show no sign of a written policy. And though trial testimony was more useful in fleshing out the boundaries of the policy, it still gave us no clear sense of when BACO's interest in the money might have attached, potentially leaving us adrift in the ocean of contract law. Further complicating this issue is the fact that at least one court has

found that a corporate interest in the form of a constructive trust attaches immediately upon a fiduciary's misappropriation of corporate funds. See, e.g., Murphree v. United States, 867 F.2d 883, 885 (5th Cir. 1989). If Michigan follows similar law, the Commissioner would have a colorable argument that Barrow's hospital income was actually attributable to BACO, if the government can prove that this was a misappropriation of a corporate opportunity.

The Commissioner argued none of this, however, and so we find that the policy simply affirmed BACO's adherence to the common-law doctrine of the fiduciary duty of loyalty, as codified in Mich. Comp. Laws Ann. secs. 450.1541 (West 1973), commonly known as the Michigan Business Corporation Act (MBCA). Because BACO was incorporated in Michigan, we look to Michigan common law and the MBCA to determine whether a breach of duty occurred and if so, when BACO's interest in the money attached. We look to the laws in place at the time of the behavior in question; in this instance, the version of the law in effect from 1977 through the end of 1989 would control.

Under Michigan common law, an officer or director misappropriates a corporate opportunity and thereby breaches his fiduciary duties when

> there is presented to a corporate officer or director a
> business opportunity which the corporation is
> financially able to undertake which is, from its
> nature, in the line of the corporation's business and

is of practical advantage to it, and which is one in which the corporation has an interest or a reasonable expectancy, and if, by embracing the opportunity, the self interest of the officer or director will be brought into conflict with that of this corporation ***.

Prod. Finishing Corp. v. Shields, 405 N.W.2d 171, 174 (Mich. Ct. App. 1987) (citations and quotation marks omitted). In cases of such a breach, "all profits made and advantage gained by the agent in the execution of the agency belong to the principal." Mechem, 1 Mechem on Agency (2d Ed.), sec. 1224 (cited in Prod. Finishing, 158 Mich. App. at 486).

For all periods before September 1987, when Barrow became a full-time manager, it is not clear that Barrow's hospital income was "in the line of the corporation's business" or that BACO had "an interest or a reasonable expectancy" in the income. During that time Barrow served only as director and chairman of the hospital. We think it illogical to assume that an accounting firm would want or benefit from a position as director or chairman of a troubled hospital; we therefore find these activities to be mere civic activities for Barrow.

Our reasoning is different for the period from September 17, 1987 through March 31, 1989, a time during which Barrow provided accounting services and BACO staff to help the hospital's billing and accounting departments. Barrow admits that during this time income he earned from the hospital should have been turned over to BACO. Therefore, the only time in which BACO may have had an

interest in Barrow's income would be September 17, 1987, through March 31, 1989.  But we find it unnecessary to reach the question of whether Barrow actually breached a fiduciary duty during that time, because even if Barrow breached his fiduciary duty by misappropriating the hospital income, under Michigan law BACO should have filed suit against Barrow to recover the alleged interest in the misappropriation "within 3 years after the cause of action has accrued, or within 2 years after the time when the cause of action [was] discovered."  Mich. Comp. Laws Ann. sec. 450.1541(2)(West 1989).  Therefore, even if Barrow did breach his fiduciary duty and violate the noncompete policy, BACO never actually filed suit, either within the following 3 years or within 2 years after his criminal conviction in which his alleged misappropriation was revealed.  Such a suit was never brought, and the money remained with Barrow under an undisputed claim of right.  Therefore, we find that Barrow correctly put this money on his 1040 rather than on the BACO corporate return.

C.   Fraudulent Intent

The Commissioner must prove fraud separately for Barrow's 1984 and 1986 tax years, and for BACO's 1988 and 1989 tax years. See Temple v. Commissioner, T.C. Memo. 2000-337, affd. 62 Fed. Appx. 605 (6th Cir. 2003).  The Commissioner may use circumstantial evidence to meet his burden--this includes using Barrow's entire course of conduct during the tax years at issue.

Parks, 94 T.C. at 664.  But we won't find fraud where the circumstances merely lead to a suspicion of fraud.  Id.  To show fraud by circumstantial evidence, the Commissioner may point to what we have identified as "badges of fraud"--factors which tend to show the required intent to evade tax.  These include these badges which the Commissioner argues apply to this case:

- Pattern of consistent underreporting of income, Miller v. Commissioner, T.C. Memo. 1989-461;

- Failure to keep adequate books and records, Richardson v. Commissioner, 509 F.3d 736, 743 (6th Cir. 2007), affg. T.C. Memo. 2006-69; Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), affg. T.C. Memo. 1984-601;

- Diverting corporate assets for personal use, Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603;

- Education and business knowledge of the taxpayer, Solomon, 732 F.2d at id. 1461;

- Prior tax-related convictions, Wright, 84 T.C. at 643-44; and

- Dishonest dealings with others, Solomon, 732 F.2d at 1462.

As we noted in discussing the effects of Barrow's conviction, the Commissioner doesn't have to prove the exact amount of the underpayment resulting from the fraud, only that fraud contributed to a portion of the underpayment.  See Miller v. Commissioner, T.C. Memo. 1989-461.  No single factor is necessarily sufficient to establish fraud by itself, but a combination of factors may be persuasive.  Ferguson v.

<u>Commissioner</u>, T.C. Memo. 2004-90. We address each of the Commissioner's arguments in favor of finding fraud.

### 1. <u>Consistent Pattern of Understating Income</u>

The Commissioner claims that Barrow--and consequently BACO--engaged in a consistent pattern of understating income, and that this habit is an indicator of fraud. There are two categories of BACO income that the Commissioner believes the company excluded which relate to adjustments made to Barrow's individual income.

The first category includes all checks payable to BACO but deposited into Barrow's personal account. Barrow's response is that they represent repayment of loans he made to BACO. The Commissioner says that, despite the repayment theory, it remains income to BACO because the payor's intent was to pay BACO. But no one disagrees: The Commissioner admits that, after a thorough examination of the available records, BACO reported all but one of the checks in this category as income on its books. Only the $8,352 check from Ernst & Whinney was not included. The Commissioner does claim that the money Barrow deposited in his personal checking account as loan repayments should be income to Barrow because there were no written loan agreements in place between Barrow and his company. Although no written loan agreement existed between Barrow and BACO, Cynthia Nobles, William Aldridge, and even IRS agent Stephen Wernert all testified that they knew Barrow made loans to BACO. Because

there were never any written loan documents and Barrow maintained authority over BACO's general ledger, the Commissioner argues that it's possible that Barrow was simply lending BACO its own funds and that Ms. Nobles couldn't have known the actual source of funds for the loans.[16]  But this is sheer speculation.  Based on credible testimony at trial, we find that Barrow made loans to his own business from his own funds during hard times.  But, even so, the Commissioner says, Barrow should have posted loan repayments to BACO's general register and issued a check as repayment of the debt.  This may have been better business practice, but its absence is not a plausible marker of fraudulent intent in this case.  Given Barrow's hectic schedule during those years and the fact that BACO was closely owned, there is no way we can find he had fraudulent intent when he deposited funds directly into his own account after recording the funds as income on the BACO ledger.

The second category of purported BACO income consists of the checks paid to Barrow from NCH and its affiliates for board of directors' and chairman's fees.  The Commissioner points to BACO's policy that all income earned by its officers and employees from clients for services the firm also offered was income to BACO.  But we've already found the Commissioner's

---

[16] We must note that the Commissioner includes imputed interest income resulting from these contested loans in the notice of deficiency.

position on corporate diversion is judicially estopped, and in the alternative, that he cannot now enforce BACO's noncompete policy to recategorize the income without showing that BACO itself successfully sought to recover it.

The Commissioner also claims two additional types of underreporting by Barrow individually.  One involves unreported wages from BACO, and another comes from CIS.  The Commissioner used the bank-deposits method--a method long approved by our Court, see Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977)--to reconstruct what he believes to be CIS's true income.  "The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income."  DiLeo v. Commissioner, 96 T.C. at 868.  Barrow argues that the Commissioner uses a different method of accounting than he did to construct his CIS income making it is impossible for him to determine where his own errors may lie.  But Barrow is confusing method of accounting with method of proof.  The Code requires the Commissioner to use a taxpayer's method of accounting (i.e. cash or accrual) as long as it clearly reflects income.  Sec. 446(a). But the Commissioner can use a variety of methods, including the bank-deposits method, to prove that Barrow underreported his income.  Holland v. United States, 348 U.S. 121, 130-132 (1954); Goichman v. Commissioner, T.C. Memo. 1987-489.

Barrow agrees that he understated his income for several years, but he also claims that the understatements were much smaller than the Commissioner alleges and due to unintentional errors. Because of the importance of this issue, we will analyze each year that is not subject to collateral estoppel individually to determine what portion of the understatements Barrow can credibly defend. But we are aware he need not prove errors in the deficiency determinations themselves. As we have previously explained, we will not "bootstrap a finding of fraud upon a taxpayer's failure to prove [the Commissioner's] deficiency determinations erroneous." Parks, 94 T.C. at 661. Barrow only needs to prove by a preponderance of the evidence that he lacked fraudulent intent to remove this as a badge of fraud.

### a. 1984

The following chart summarizes changes the Commissioner made to Barrow's individual adjusted gross income (AGI) during the audit for 1984, and reflects the changes that Barrow concedes:

| Change to Barrow's AGI | 1984 per IRS | 1984 per Barrow |
|---|---:|---:|
| BACO dividends | $7,694.07 | --- |
| NCH board fees | --- | $785 |
| CCHS board fees | --- | 3,536 |
| CIS schedule C receipts | 23,627.43 | 23,627.43 |
| BACO salary | 76,015.84 | 76,015.84 |
| **Total understatement** | **107,337.34** | **103,964.27** |

Although he admits an understated amount similar to the one calculated by the Commissioner, Barrow contends he didn't commit fraud with regard to any portion of it in 1984. He claims the amounts the Commissioner calculates as BACO dividends were actually loan repayments.

As for the missing NCH board fees, he argues that the original NCH Form 1099 reported fees of only $3,373.07. After reviewing payment records, Barrow now concedes he should've reported $785 more but says his was an honest mistake caused by his using the number reflected on the original Form 1099. He also now concedes that his CCHS fees began in December 1984, but he says he didn't receive a Form 1099 from CCHS for that first payment, and as a result he unintentionally failed to include those fees on his 1984 return. He also admits that he underreported the CIS receipts but says that it is a result of errors made by Nobles when she prepared the CIS books. These errors included deposits omitted from the CIS ledger.

Finally, Barrow agrees that he underreported his BACO salary, but he says this was because he mistakenly used his 1985 W-2 instead of the 1984 W-2. He explains that he kept a separate folder for each tax year and that somehow the 1985 W-2 got into the 1984 folder. This led Nobles to use the 1985 figure when preparing the ledger Barrow later used to prepare his taxes.

Barrow's assertion that he received an incorrect Form 1099 from CCHS in 1984 is credible. We've recounted the chronic disorganization at the hospital already--a problem that later led BACO to step in and start helping in 1987. It's reasonable that Barrow unintentionally made mistakes reporting his CCHS board fees because of the hospital's disorganization and Barrow's own preoccupation with the mayoral race during those years.

We are also convinced that Nobles made significant mistakes and that Barrow unintentionally missed many of them. Nobles testified that Barrow was her supervisor and generally the person reviewing her work. Donna West, a principal who started at BACO in 1988, testified that she had the opportunity to review some of Nobles's work and thought Nobles sometimes didn't pay enough attention to detail. The Commissioner argues that Barrow "turned a blind eye" to Nobles's mistakes. It's true that Barrow probably should have taken steps, such as hiring a tax accountant, to ensure proper reporting. But "turning a blind eye" indicates negligence, and "[f]raud 'does not include

negligence, carelessness, misunderstanding or unintentional understatement of income.'" <u>Zhadanov v. Commissioner</u>, T.C. Memo. 2002-104 (citation and quotation marks omitted). Also, Nobles worked closely with Barrow and credibly testified that he never asked her to do anything improper or that she felt she shouldn't do. We will not use the underpayment in 1984 as a badge of fraud.

### b. <u>1986</u>

The following chart reflects income changes made during the IRS audit for 1986 that amounts to understated income and Barrow's response:

| Change to Barrow's AGI | 1986 per IRS | 1986 per Barrow |
|---|---|---|
| BACO dividends | $66,607.58 | --- |
| CIS schedule C receipts | 24,399.47 | 24,399.47 |
| BACO capital gains | 1,450 | --- |
| **Total understatement** | **92,457.05** | **24,399.47** |

Barrow says he didn't commit fraud with regard to any portion of his underreported income in 1986. He claims the IRS's dividends and capital gains calculation improperly includes board fees that he already included on his Form 1040 because they were not earned in violation of BACO's policy. It also includes repayment to Barrow of BACO loans.

He accounts for the additional CIS income by explaining that the IRS included in CIS's 1986 income two deposits made in

January 1987.  Because they were made in the following year, Nobles didn't record them as 1986 income.  He concedes that these payments are income in 1986, but he argues that this was an honest mistake, not due to fraud.

We've already dismissed the Commissioner's arguments regarding corporate diversion and determined that Barrow's loan repayments weren't fraudulent.  For reasons similar to those discussed earlier, we believe Nobles made mistakes and that Barrow's explanation of those mistakes for 1986 are credible.  We thus won't credit the underpayment from 1986 as circumstantial evidence of Barrow's fraudulent intent.

We do find that there was a pattern of underreporting because Barrow failed to report some taxable personal income to the IRS each year from 1984 until 1988.  For the several reasons provided in this section, however, we do not find this pattern of underreporting to be a badge of fraud.

### c.   BACO's 1988 and 1989 Income

The Commissioner claims that Barrow understated BACO's income by not including the following items:

| BACO's Unreported Income | | | | | |
|------|------|------|------|------|------|
| Year | NCH | CCHS | NCC-W | NCC-E | Ernst & Whinney |
| 1988 | $63,955.66 | $64,811.55 | --- | --- | |
| 1989 | 63,513.66 | 54,563.80 | $4,500 | 9,000 | 8,352 |

We've already found that the fees paid to Barrow relating to NCH and its affiliates do not belong to BACO but Barrow individually.  This eliminates all of the income the Commissioner claims BACO failed to report for these two years except the Ernst & Whinney check.  Barrow concedes that he should've included this check in BACO's 1989 income, but he says Nobles mistakenly omitted it from the general ledger.  We believe him; and though the omission of this check from the general ledger was mistaken, and might be negligent, we find its omission was not fraud.[17]

## 2.    Failure To Keep Adequate Books and Records

The Commissioner contends that the books for BACO were so poorly maintained that he was unable to reconcile the expenses reported on BACO's tax return to BACO's general ledger.  He also repeats his argument that the general ledger omitted large amounts of gross income, including hospital chairman's fees paid to Barrow for accounting services.  The Commissioner again points out that BACO failed to include in gross revenues a check for $8,352 from Ernst & Whinney in 1989.  Barrow again admits that he

---

[17] The elimination of the hospital fees from BACO's income also means that BACO likely didn't understate its income for these two years either.  The Commissioner looked back to tax years 1983-87 to recalculate BACO's net operating loss available for 1988 and 1989.  While he is able to use this method of recalculation, see Hill v. Commissioner, 95 T.C. 437, 441 (1990), he shouldn't have included the hospital fees in BACO's income for purposes of the recalculation in those years either.  Because he did so, he also improperly reduced the net operating loss carryforward available for 1988 and 1989.

should've reported this check on BACO's return instead of his own. But Barrow also says that this was a mistake, one of many small oversights that the IRS is adding together to portray intentional misconduct. And because we aren't considering BACO's returns at all for this examination of fraud, many of the Commissioner's arguments fall outside of our analysis.

The Commissioner also takes issue with Barrow's recordkeeping for items relating to his personal income tax. To support this argument he refers us generally to the record, and says that often Barrow's wages, dividends, and corporate distributions were not accounted for in his personal checkbook. But we've already detailed Barrow's credible response--he mistakenly used the wrong W-2, relied on an incorrect Form 1099, and received nontaxable loan repayments from BACO. And we've dismissed the Commissioner's corporate-diversion theory, so the hospital fees were properly counted as his personal income.

The Commissioner also argues that Barrow's CIS checkbook failed to reconcile with his Schedule C gross receipts. After completing a bank-deposits analysis, the Commissioner claims he discovered that gross bank deposits exceeded gross receipts. Barrow admits problems with his CIS ledger, but mainly attributes these mistakes to errors made by Nobles. Again, we believe Barrow was negligent in his reliance on Nobles, but we found that he didn't intentionally doctor the CIS books to hide income.

Although Barrow may have been careless with his bookkeeping, there is no evidence that he attempted to conceal assets or withheld information from the IRS during the audit. In fact, we find that Barrow cooperated with the IRS audit at all times. See Kemp v. Commissioner, T.C. Memo. 2004-153; McGowan v. Commissioner, T.C. Memo. 2004-146 affd. 187 Fed. Appx. 915 (11th Cir. 2006). Barrow credibly testified that when IRS Agent Bulik went to the BACO offices for information, he "went to the files and gave him everything that was in the file," even copies of draft agreements never put into place. IRS Agent Bulik was asked at trial about the condition of Barrow's business records, and his response was that "[t]hey were easy to follow * * * [t]hey were in order." Barrow's cooperation and Bulik's testimony about his organization cut against any inference of fraud we might otherwise draw from mistakes in his bookkeeping.

### 3. Diverting Corporate Assets for Personal Use

The Commissioner argues that Barrow diverted BACO funds for his own use, and that this is evidence of fraud. But we've already determined that the Commissioner cannot pursue this theory. The Commissioner also points out that Barrow tried to conceal the receipt of NCH checks into his personal account by stamping BACO's endorsement onto the canceled checks. While we agree that this behavior was deceptive, we find that it was

intended to deceive Barrow's journalistic inquisitors, not the
IRS.

### 4.    Barrow's Education and Business Knowledge

The Commissioner portrays Barrow as someone sophisticated in
tax matters.  We agree that Barrow was highly educated and
experienced in accounting and finance.  But Barrow maintains that
his specialty was in auditing and financial reporting, and that a
CPA is not necessarily an expert in every area in which he has a
license to practice.  He even suggests that if he had a deeper
knowledge of tax law, he wouldn't have permitted himself to be
convicted on the basis of explainable transactions in the
criminal trial.  Barrow was an entrepreneur and budding
politician, mainly focused on the nontax activities of saving a
struggling hospital and expanding his reputation as a civic
leader in Detroit.  And even in cases that involve attorneys or
accountants with a proven knowledge of tax law, we have not found
fraud where the specific intent to evade tax didn't exist.  See,
e.g., Dajos v. Commissioner, T.C. Memo. 1986-330.

### 5.    Prior Tax-Related Convictions

A criminal court convicted Barrow for tax evasion and
willfully filing false individual tax returns for 1985, 1987, and
1988, and for doing the same with respect to BACO's corporate tax
returns in fiscal years 1988 and 1989.  The Commissioner contends
that, although not dispositive, these convictions are evidence of

fraudulent intent in other years. Barrow argues that his convictions were wrongly decided, but since we don't have the power to overturn them, we must take them at face value. We agree that this factor weighs against Barrow.

6. Dishonest Dealings With Others

The Commissioner claims that Barrow engaged in a pattern of deceptive conduct that reflects his fraudulent intent. The Commissioner argues the following behavior supports his claim: First, the Commissioner says Barrow made false statements to procure loans. Barrow submitted unfiled tax returns to financial companies showing more income than reported to the IRS in order to obtain bank loans. And a jury did convict him for making false statements in connection with a bank loan application and for bank fraud. See 18 U.S.C. secs. 1014, 1344 (2006).

Second, the Commissioner says Barrow made false statements to business associates. The Commissioner claims Barrow concealed his ownership of CIS from his colleagues on the board of NCH. Barrow credibly testified that although he may not have specifically disclosed CIS to be his personal Schedule C business, he informed both NCH and the bankruptcy court that CIS was affiliated with BACO. We find that Barrow honestly thought this somewhat analogous disclosure was enough.

The Commissioner also claims Barrow hid the same information from the Bankruptcy court while serving as trustee of Salem

Mortgage, causing the court to approve a contract between Salem Mortgage and CIS.[18]  The application instead says that BACO owned a minority interest in CIS.  Although this information isn't accurate, it is consistent with Barrow's explanation that he considered CIS to be part of the BACO business plan.  We find that this half-hearted disclosure doesn't indicate that Barrow had a pattern of dishonest dealings.

The Commissioner next argues that Barrow engaged in self-dealing by approving NCH's bills payable to BACO while requiring his consent to pay other vendors in hard financial times.  Barrow claims that while NCH had cashflow problems, he extended the payment due dates of many of NCH's creditors.  And we already have discussed how Barrow waited to cash some of the chairman's fee checks until NCH had cash in the bank to actually pay those obligations.  In this light, and with knowledge that BACO was already reducing its normal rates for BACO employees working at NCH, we find no evil intent or malicious purpose behind Barrow's dealings with the hospital.

Finally, the Commissioner points out that Barrow made false statements while campaigning.  The Commissioner cites, and Barrow admits to, lying to the media during Barrow's campaign by telling one reporter that NCH wasn't paying him for his work on the board

_____

[18] Salem Mortgage was one of BACO's clients.  When it slipped into bankruptcy, Barrow became its court-appointed trustee.

and with the hospital affiliates.  Barrow admits that he wasn't always forthright with the media during his campaigns in 1988 and 1989, but again we attribute this more to fear of candor's effect on his political career than proof of an intent to defraud the IRS.

Despite Barrow's many mistakes, we find that the Commissioner offers no clear and convincing proof that Barrow possessed the specific intent to evade a tax that he believed he owed for 1984 or 1986, or that BACO owed for 1988 or 1989.  We therefore find, not just that the Commissioner has failed to show by clear and convincing evidence that Barrow filed his 1984 and 1986 tax returns, and BACO's 1988 and 1989 tax returns, with fraudulent intent, but that Barrow had no fraudulent intent with regard to any portion of his 1984 and 1986 underpayments, or BACO's 1988 and 1989 underpayments.  We therefore hold that the statute of limitations imposed by section 6501(a) precludes the Commissioner from assessing the deficiencies and additions to tax that might otherwise be due for those years.

II.  <u>Determination of Barrow's 1985, 1987, and 1988 Tax Liability</u>

Our task for the years in which Barrow is collaterally estopped from denying fraud is to redetermine the amount of Barrow's deficiency.  As a general rule, we presume that the Commissioner's determinations in a notice of deficiency are correct, and Barrow bears the burden of proving those

determinations wrong. See Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

We begin by discussing the categories of income in dispute for all three years. First, as we have already found, the Commissioner is judicially estopped from pursuing his corporate-diversion theory here. Therefore, all of the NCH and CCHS fees are income to Barrow directly. Barrow claims that he would sometimes refrain from cashing the hospital's checks when they were issued because he knew the hospital didn't have the money to pay him. Some of the checks the hospital issued near the end of a calendar year were held over until the next year because of this. Barrow reported those checks in the year he cashed them because he believed the hospital's lack of cash on hand was a restriction on his ability to get paid. We agree with Barrow. We have held that when a payee knows there are insufficient funds and that knowledge causes him to refrain from cashing a check, the payment is income to him in the later year rather than the earlier. <u>Blumeyer v. Commissioner</u>, T.C. Memo. 1992-647 (discussing knowledge of insufficient funds as an exception to the relation back doctrine). To the extent Barrow reported fees in a year subsequent to the check's issue date because of insufficient funds, we find him taxable in the later year.

Second, we find that all of the checks made payable to BACO that Barrow deposited into his account as loan repayments are

neither capital gains nor ordinary income taxable to Barrow.  See Theodore v. Commissioner, 38 T.C. 1011, 1040-41 (1962).  The Commissioner admits that all of the checks were recorded in the BACO ledger and although Barrow should've deposited them into a BACO account and then issued a check for loan repayment, we find that this mistake doesn't change the character of this income.

A.    Issues for 1985

After resolution of the corporate-diversion and loan-repayment issues above, there remain only these challenged items from his 1985 tax return:

| Disputed 1985 Adjustments | | |
|---|---|---|
| Item | Per IRS | Per Barrow |
| Schedule C Depreciation | $11,777.36 | $8,877.36 |
| Schedule C Receipts - CIS | 1,000 | -- |

Barrow claimed $2900 Schedule C depreciation for his 1977 Cessna airplane in 1985, which the Commissioner denied.  He and Barrow now argue over substantiation and whether Barrow used the plane for business, rather than personal, reasons.  Barrow says that he provided trip and engine logbooks, as well as time slips and other substantiation of the plane expenses, to Agent Bulik. Initially, Bulik testified that Barrow showed him some records relating to his airplane, but that Barrow wouldn't let him take them or make copies.  Later on, Bulik recalled that during the audit he used copies of documents showing the use of the plane,

records of places traveled, and an engine log to deny the expenses.  Barrow claims the Commissioner lost the material he handed over for substantiation, and argues that he's entitled to an inference that if the records were available, they would favor him.  He also asks us to apply the Cohan rule and estimate the amount of the expenses.  See Cohan v. Commissioner, 39 F.2d 540(2d Cir. 1930).

It is a rote statement for this Court to declare that the taxpayer bears the burden of proving a claimed deduction. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The taxpayer must maintain records sufficient to substantiate such amounts.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  But when the taxpayer is unable to meet this burden because the IRS loses his records, we may estimate the allowable amount.  The wrinkle here is that section 274(d) expressly overruled Cohan for certain types of business deductions (including travel) by imposing strict substantiation requirements.  See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969).  Barrow appears to have provided documentation--the logbook--that would have complied with section 274(d), but it was lost by the IRS and there are no backup copies available. Section 1.274-5A(c)(5), Income Tax Regs., exempts a taxpayer from these strict requirements when there is a loss of records beyond his control.  That's what happened here.  Faced with such

difficulties, we believe Barrow's and Nobles's testimony that the logbook verifies that deductions taken in conjunction with the plane were for business use, and characterize as a credible substantiation their testimony that the logbook would also have verified their amount. We therefore sustain the amounts claimed by Barrow on his returns.

Barrow also contests the Commissioner's upward adjustment of CIS's income by $1,000. Barrow says he is unable to determine which deposit contains an error and account for the difference because the IRS switched from the "bank deposits method of accounting" to the "taxable checks" method in order to make this adjustment, and in any case didn't reconcile their method of accounting with the cash method that he used for CIS in the same year. We've already pointed out that the Commissioner may use a variety of methods of proof to uncover a taxpayer's unreported income. And Barrow's complaint about this isn't enough to meet his burden to refute the Commissioner's determination, so we find that he is liable for the $1,000 difference.

There are two additional 1985 computations that Barrow disputes--the addition of self-employment tax and the AMT. Barrow admits that he failed to include the self-employment tax calculation when he filed his 1985 tax return, and that he was liable for the tax. Since both items are computational, they will be recalculated under Rule 155. But Barrow also seems to

dispute whether these items can be counted as part of the 1985 deficiency for purposes of the fraud penalty if all of the information needed to calculate them was available on his original return as filed. We think this issue is directly related to the computation of the fraud penalty, and we address it below.

B. Issues for 1987

Barrow concedes that his 1987 CIS income should increase by $11,279 because he is now unable to find his ledger for that year, and agrees with other adjustments made by the Commissioner. We have found against the Commissioner on the issue of whether Barrow was receiving corporate distributions rather than repayments of loans. There remain only these challenged items from his 1987 tax return:

| Disputed 1987 Adjustments | | |
| --- | --- | --- |
| Item | Per IRS | Per Barrow |
| Sch C Depreciation | $8,803.49 | $5,903.49 |
| Sch C Expenses | 13,799 | 10,237.28 |
| Cost of Sales | 6,500 | --- |
| Imputed Interest Income | 3,693.03 | --- |
| Passive Partnership /1120S | 5,658.75 | --- |

Barrow claimed Schedule C depreciation and expenses for his car, boat, and plane in 1987. The Commissioner denied all of the expenses and Barrow now contests only those related to his airplane -- $2900 for depreciation, and $3561.72 for other

expenses.  He makes the same argument that he did for his 1985 airplane expenses, we agree with him again.

Barrow provides a recalculation of his tax liability for 1987 in a simple chart.  As part of this effort, he determines that there should be no adjustment for cost of sales, imputed interest income, or passive partnership income.  The notice of deficiency explains that the cost of goods sold was reduced by $6500 because Barrow didn't establish that the amount was paid or incurred during 1987 or that the expense was ordinary and necessary.  The notice of deficiency also determines that "since [Barrow] made loans to [BACO] at below market interest rates, interest income is imputed to [him] for 1987 and 1988."[19] Finally, the passive partnership adjustment stems from a determination that the losses from Hambrose Leasing, an entity on Barrow's return not otherwise involved in this case, are subject to at-risk limitations and passive-loss limitations for 1987 and 1988.  Barrow fails to explain why he disputes these items. Therefore, he doesn't meet his burden to show that the notice of deficiency is wrong, and so we cannot relieve him of liability for these items.

C.  <u>Issues for 1988</u>

---

[19] Although this adjustment is inconsistent with the Commissioner's theory in this case, it is consistent with our findings that Barrow did in fact make loans to BACO.

There remain only these challenged items from his 1988 tax return:

| Disputed 1988 Adjustments | | |
|---|---|---|
| Item | Per IRS | Per Barrow |
| Interest Income | $(1,692) | --- |
| Itemized Deductions | 6,097.55 | $4,750 |
| Sch C Expenses | 2,751 | 844 |
| Imputed Interest Income | 2,728.52 | --- |
| Loss on Sale of Asset | 9,040 | --- |

The Commissioner denied Barrow's Schedule C airplane expenses of $1,906.45. He makes the same argument that he did in 1985 and 1987, and we reach the same result.

Barrow also contests the adjustments to his interest income, itemized deductions, imputed-interest income, and loss on sale of asset. The Commissioner claims that Barrow received $1,692 less in interest than reported, and we are unsure why Barrow disputes this adjustment. In any event, we will sustain the Commissioner on this.

The Commissioner reduces Barrow's itemized deductions by $6,097.55. Based on the notice of deficiency, it appears as though Barrow agrees only with the reduction in his charitable contributions to the extent of $4,750. Since Barrow makes no argument with regard to any other of these changes, we find that he doesn't meet his burden of proof. The Commissioner also adds imputed interest income, which we uphold for the same reasons we

did for the similar 1987 adjustment.  Finally, the Commissioner denies Barrow a loss on the sale of an asset because Barrow failed to prove it was a loss he sustained.  Barrow makes no additional showing here, so we must also uphold the Commissioner's adjustment of this item.

III. <u>Fraud Penalty</u>

We've held that Barrow is collaterally estopped from denying fraud for 1985, 1987, and 1988 for purposes of former section 6653(b).  This makes for an interesting question:  to what extent can we determine the portion of the deficiency subject to this penalty for these years?

In 1985, section 6653(b) read as follows:

SEC 6653(b).  Fraud --

(1)  In general.--If any part of any underpayment (as defined in subsection (c))of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.

(2)  Additional amount for portion attributable to fraud.--There shall be added to the tax (in addition to the amount determined under  paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601--

(A)  with respect to the portion of the underpayment described in paragraph(1) which is attributable to fraud, and

(B)  for the period beginning on the last day prescribed by law for payment of such underpayment

> (determining without regard to any
> extension)and ending on the date of
> the assessment of the tax (or, if
> earlier, the date of the payment of
> the tax).

The 1985 statute leaves no room to determine that some part of the deficiency was not due to fraud.

We also must address the issue of the computational adjustments made to Barrow's 1985 tax liability for the AMT and self-employment tax.  The Commissioner will recalculate Barrow's 1985 tax liability after we file this opinion and adjust the AMT and self-employment tax calculations based on our findings, so we need not settle disputes over the correct amounts of those calculations now.  But because we are bound by the 1985 version of section 6653(b) to apply the fraud penalty to the entire underpayment for that year, the question arises:  Does the fraud penalty also attach to adjustments that are purely computational in nature?

We begin with the language of the Code:

> SEC.6653 (c). Definition of Underpayment.--
> For purposes of the section,the term
> "underpayment" means--
>
> > (1)  Income, estate, gift, and certain
> > excise taxes.--In the case of a tax to
> > which section 6211 (relating to income,
> > estate, gift, and certain excise taxes)
> > is applicable, a deficiency as defined
> > in that section (except that, for this
> > purpose, the tax shown on a return
> > referred to in section 6211(a)(1)(A)
> > shall be taken into account only if such

> return was filed on or before the last
> day  prescribed for the filing of such
> return, determined with regard to any
> extension of time for such filing)***

> \*   \*   \*   \*   \*   \*   \*

This tells us that an underpayment for purposes of section 6653(b) equals the deficiency as defined in section 6211.  And section 6211 provided:

> SEC. 6211(a).  In General.--For purposes of this title in the case of income, estate, and gift taxes imposed by subtitles A and B and excise taxes imposed by chapters 41, 42, 43, 44, and 45 the term "deficiency" means the amount by which the tax imposed by subtitle A or B, or chapter 41, 42, 43, 44, or 45 exceeds the excess of--
>
> > (1)  the sum of
> >
> > > (A)  the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
> > >
> > > (B)  the amounts previously assessed (or collected without assessment) as a deficiency, over--
> >
> > (2)  the amount of rebates, as defined in subsection (b)(2), made.

Because the Commissioner included the AMT and self-employment tax in the notice of deficiency, we find that if they still exist after the computations called for by Rule 155, they are part of the underpayment for purposes of the fraud penalty in 1985.

In 1987, the Code provided:

> SEC. 6653(b). Fraud.--

(1)  In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

(A)  75 percent of the portion of the underpayment which is attributable to fraud, and

(B)  an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax.

(2)  Determination of portion attributable to Fraud.--*If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud.*

(Emphasis added).  The 1987 statute may leave room for a determination of which part of the underpayment is due to fraud.

In 1988, the statute read as follows:

SEC. 6653(b). Fraud.--

(1)  In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a

return is due to fraud, there shall be
added to the tax an amount equal to 75
percent of the portion of the
underpayment which is attributable to
fraud.

(2)  Determination of Portion
Attributable to Fraud.--If the Secretary
establishes that any portion of an
underpayment is attributable to fraud,
*the entire underpayment shall be treated
as attributable to fraud, except with
respect to any portion of the
underpayment which the taxpayer
establishes is not attributable to
fraud.*

(Emphasis added).  As with 1987's, the 1988 fraud section also
allows a more precise determination of the amount of the
underpayment due to fraud.  The question remains:  can we
determine that there is no deficiency due to fraud for 1987 and
1988 in the light of our application of collateral estoppel in
this case?

We find the answer in our opinion in Franklin v.
Commissioner, T.C. Memo. 1993-184.  In that case, we found that
while the Commissioner had proven that the taxpayer had underpaid
his taxes, and that he had underpaid with fraudulent intent,
neither the taxpayer nor the Commissioner provided evidence of
the specific amount of that underpayment.  We said that "to
adjudicate an addition to tax under section 6653(b)(2), first we
must examine the evidence and satisfy ourselves as to the *amount*
that clearly and convincingly is an underpayment.  Then, we must

determine whether any or all of such amount clearly and convincingly is due to fraud." Id. We also recognized that estimating the taxpayer's underpayment at zero or a nominal amount would be inconsistent with a guilty plea by the same taxpayer to obtaining "substantial income" from certain illegal activities. Instead, we estimated the underpayment due to fraud for each of the years at issue.

We face a similar task in this case. While we acknowledge that in the criminal case the government proved beyond a reasonable doubt that some part of Barrow's underpayments for 1987 and 1988 were due to fraud, the Commissioner in this case failed to prove to us that any particular underpayments were actually due to fraud. We recognize that it would be inconsistent to hold no part of the underpayment due to fraud, so as we did in Franklin, we estimate that $500 in 1987 and 1988 was due to fraud for purposes of applying the fraud penalty.

## Conclusion

No part of any underpayment of Barrow's 1984 or 1986, or BACO's 1988 and 1989, deficiencies was due to fraud and so we do not sustain the Commissioner's determination for those years.

The parties will, however, need to compute Barrow's 1985, 1987, and 1988 deficiencies, so

- 70 -

<u>Decisions will be entered under</u> <u>Rule 155</u>.